393 So.2d 940 (1981)
Jack C. HUDGENS, Plaintiff-Appellant,
v.
INTERSTATE BATTERY SYSTEMS OF AMERICA, INC. et al., Defendants-Appellees.
No. 8042.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1981.
*941 Ward, Steinman & Karst, C. Edward Karst, Alexandria, for plaintiff-appellant.
Terrence C. McRea, of Franklin, Moore & Walsh, Baton Rouge, Downs & Downs, James C. Downs, Alexandria, for defendants-appellees.
Before DOMENGEAUX, STOKER and LABORDE, JJ.
DOMENGEAUX, Judge.
This is a products liability case involving an allegedly defective battery. Plaintiff, Jack C. Hudgens sued Interstate Battery Systems of America, Inc., and Globe Union, Inc., as the manufacturers of an automotive storage battery which allegedly exploded on February 17, 1978, causing eye and facial injuries to plaintiff. Plaintiff also sued Interstate's and Globe Union's insurer, Employers Insurance of Wausau, and Troy H. Barron, d/b/a Barron's Exxon Service Center, the alleged retailer of the battery.
On Friday, February 17, 1978, at about 6 P.M., plaintiff was at his home in Lena, Louisiana, and was preparing to return his employer's truck to his employer's place of business in Alexandria, Louisiana. His wife was to follow him in her son's car in order to provide plaintiff with a ride home after the truck was returned. The car, however, would not start. Plaintiff raised the car's hood and peered at the engine. It was dark, though, so Mrs. Hudgens offered to get a flashlight from the house. Plaintiff refused this offer and lit a match for light instead. He jiggled the battery cables, thinking they might be loose, but they were not. He then extinguished the flame since the fire had nearly consumed the length of the match. To this point, the above facts are undisputed.
According to plaintiff, who was the only witness,[1] he then lit a second match and was poised directly over the radiator, about two feet from the battery (which was to his left), when a small explosion highlighted by a flash of light occurred, splashing battery acid in his face, causing the eye and facial injuries complained of herein. The facts as plaintiff remembers them, from the time he lit the second match until the explosion occurred, were sharply contested during the trial and will be discussed at length below.
After the incident plaintiff discovered that one of the two battery caps was missing, although he testified he remembered seeing both caps on the battery prior to the explosion.[2] He also discovered that a small hole in a bottom corner of the battery had allowed electrolyte to escape from one cell of the battery. This explained why Mrs. Hudgens could not start the car.
Plaintiff's suit was tried before the district court on February 22, 1980. The court rendered judgment dismissing plaintiff's suit against all defendants. The judgment was signed April 8, 1980. With respect to the three manufacturer defendants the court concluded that plaintiff failed to carry his burden of proof. The court granted a motion for a directed verdict in favor of the remaining defendant, Troy H. Barron, the alleged retailer of the battery, because that defendant "only handled the battery and did nothing."
Plaintiff contends the district court erred (1) in finding that plaintiff failed to carry his burden of proving that the battery was defective, that the product was in normal *942 use at the time of the injury and that the defect caused the injuries; and (2) in finding that the manufacturer took all reasonable and appropriate steps to post a warning that could warn the customary user.
We affirm.

LIABILITY OF THE MANUFACTURER
Before the manufacturer of the battery, Globe Union, Inc., will be held liable, plaintiff must establish (1) that the battery was defective (that is, unreasonably dangerous in normal use), (2) that the battery was in normal use when the explosion occurred, and (3) that the defect caused the injury. Weber v. Fidelity & Casualty Insurance Co., 259 La. 599, 250 So.2d 754 (1971); Dixon v. Gutnecht, 339 So.2d 1285 (La.App. 1st Cir. 1976). Plaintiff's action is defeated because he failed to prove that the battery was defective.
Plaintiff argues in brief that the battery was defective because (1) the walls of the battery were too thin, and (2) the battery contained an insufficient warning label. Before disposing of plaintiff's arguments pertaining to the alleged defects of the battery, we will summarize the evidence contradicting plaintiff's account of the facts.
Plaintiff's version of the facts, from the time he lit the second match until the explosion occurred moments later, was sharply refuted by the defendants' expert witness, Mr. Everett C. Wilson. Mr. Wilson, the Technical Services Manager for Globe Union Company, Inc.,[3] was recognized by the court as an expert in battery handling and installation processes. Mr. Wilson had investigated battery explosions for Globe Union for at least ten years prior to trial. He testified that the explosion could not have occurred under the factual conditions related by plaintiff, because the physical evidence contradicted Mr. Hudgens' version of the facts.
Plaintiff remembered that both the vent caps were attached to the battery and he testified that he did not remove either one. Both his face and the match were at least two feet from the battery when the explosion which splashed battery acid in his face occurred, he said. Plaintiff apparently contends that the explosion blasted the missing cap from the battery, allowing the acid to be sprayed from the battery. Mr. Wilson testified that if an explosion had occurred, one battery cap would not have been blown from the battery. Instead, the entire battery top would have been ripped off and the battery would have been heavily damaged.[4] However, no appreciable damage was done to the battery.
Mr. Wilson acknowledged that batteries produce explosive gases. However, these gases are vented through the flame barrier vent caps on top of the battery and dissipate into a harmless, non-explosive mixture within four inches of the battery top after escaping from the battery. Thus, if Mr. Hudgens' match was at least two feet from the top of the battery as he claims it was, the gases would not have ignited. Yet, even if the gases had somehow been ignited, the flames could not have traveled back into the battery to cause an explosion because the vent caps were securely in place, at least according to Mr. Hudgens. Mr. Wilson explained that the flame barrier vent caps, which were extensively tested prior to being used, were designed to allow harmful gases within the battery to exit from the battery through microscopic holes in the vent caps, but the holes were too small to allow an outside ignition source such as a flame or spark to enter the battery.
*943 Mr. Wilson theorized that Mr. Hudgens, after lighting the second match, pulled off the missing vent cap from the battery and brought his face and match within inches of the battery top to check the fluid level in the three cells beneath the removed battery cap. The match then ignited those gases near the battery which were still combustible. The flame traveled into the battery causing the acid to spew forth from the battery, striking plaintiff in the face and eyes. Mr. Wilson concluded that this factual scenario more logically accorded with the physical evidencethe undamaged battery, plaintiff's evident injuries, and the missing vent capand with the known propensity of escaping battery gases to harmlessly dissipate almost immediately after leaving the battery.
Plaintiff produced no expert testimony to counter Mr. Wilson's testimony and the trial court obviously deferred to Mr. Wilson's theory of how the accident occurred. We cannot say that the court erred.
We next consider plaintiff's arguments that the battery was defective either because the walls were too thin or because the battery contained an insufficient warning. Conceivably, the battery may have been defective even if the accident occurred in the manner suggested by Mr. Wilson. However, we find that it was not.
Were the battery walls too thin?
Mr. Wilson testified that the battery walls are 75/1000th of an inch thick. He speculated that the tiny hole which allowed electrolyte to escape from one cell was caused by a sharp object in the corner of the vehicle's battery tray.
Plaintiff's counsel theorizes that the aperture which allowed the electrolyte to seep through also allowed explosive gases and vapors to escape from the battery, which gases and vapors then ignited when plaintiff lit a second match. Plaintiff argues that the ease with which the battery casing may be punctured, allowing these harmful gases to escape, rendered the battery defective. Plaintiff also urges that because of this danger, manufacturers should be required to warn potential buyers of the battery that the 75/1000th of an inch battery walls are puncture prone.
Although the record does show that the hole drained cell number six of its electrolyte, no evidence supports plaintiff's theory that gases also escaped through the opening. In fact, Mr. Wilson testified that gases do not escape through such a hole and that the hole could have played no part in the explosion. We observe also that plaintiff presented no evidence whatsoever to show that a 75/1000th inch thickness for a battery casing is too thin or is unsafe, or that it represents a hazard to the normal user. In the absence of such evidence, we are unable to agree with plaintiff that the battery casing was defectively thin or that an added warning is necessary.
Was the warning label adequate?
We turn now to a consideration of whether the warning printed on the battery cap was sufficient. We hold that it was.
Mr. Wilson explained that a battery is an electrochemical device which stores and releases electrical current through chemical processes. A natural and unavoidable result of these processes is the generation of explosive hydrogen and oxygen gases. In its reasons for judgment, the trial court acknowledged this fact. Mr. Wilson testified that the battery industry has, for many years, been aware of the explosive potential of batteries. Therefore, warnings are placed on all wet cell automotive batteries such as the one in this case. The warning label on the battery involved herein, printed in white against a bright green background, reads:
DANGER-EXPLOSIVE GASES
BATTERIES PRODUCE EXPLOSIVE GASES. KEEP SPARKS, FLAME, CIGARETTES AWAY. VENTILATE WHEN CHARGING OR USING IN ENCLOSED SPACE. ALWAYS SHIELD EYES WHEN WORKING NEAR BATTERIES.
We believe the above warning complies with the Consumer Products Safety Commission's *944 labeling requirements.[5] The warning label on the battery herein is virtually identical to examples of acceptable warnings found in the record.
Chappuis v. Sears Roebuck and Company, 358 So.2d 926 (La.1978), is cited by plaintiff to support his claim that the battery contained an inadequate warning. The case involved a hammer whose face was already chipped when used by plaintiff. While in use by plaintiff the face chipped again, striking plaintiff in the eye. All the experts agreed that a hammer whose face is chipped should be discarded because it will likely chip again. However, the warning "discard this hammer if it becomes chipped" was not on the warning label. The Court held the manufacturers liable because the absence of such a warning was unreasonable. The Court reasoned:
"... There may be many tools or other products which become dangerous for normal use in certain conditions. But when the danger is known to the manufacturer and cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user. It would have been reasonable, in this case, for the manufacturer to add to the warning label the words `discard this hammer if it becomes chipped.' This record makes it difficult to understand why the warning was not made...."
In the instant case, the label on the battery cap warned users to keep flames away. If plaintiff had obeyed the warning this unfortunate accident would not have occurred. We find this set of facts clearly distinguishable from the facts in Chappuis, wherein the user of a chipped hammer was not warned by the label that such a use was dangerous.
Since plaintiff has failed to prove that the battery was defective when the explosion occurred, his suit against Interstate Battery Systems, Globe Union, and Employers Insurance of Wausau must be dismissed. In light of our decision, we need not elaborate upon whether the battery was in normal use at the time of the injury, nor upon the extent of plaintiff's injuries or of the medical care required.

RES IPSA LOQUITUR
Plaintiff has also relied upon the doctrine of res ipsa loquitur to prove he should recover. The doctrine does not apply. The facts and circumstances do not fairly nor reasonably lead to the conclusion that the accident was due to some omission of the defendant's duty. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972); Western Casualty & Surety Co. v. Adams, 381 So.2d 923 (La. App. 3rd Cir. 1980); Davis v. Aetna Insurance Company, 291 So.2d 486 (La.App. 3rd Cir. 1974). In fact, the defendants' expert witness, Mr. Wilson, advanced a theory which was more logical and reasonable than Mr. Hudgens' own account of the accident. The unchallenged testimony of Mr. Wilson tended to show the accident probably occurred due to plaintiff's own negligence rather than to some fault of the defendants. Furthermore, rather than being in the exclusive control of the defendants, which it must be for the doctrine to apply, the battery was in the exclusive control of Mr. Hudgens. Davis v. Aetna Insurance Company, supra. Therefore, the doctrine is not available to plaintiff in this instance.

LIABILITY OF THE RETAILER
Troy Barron, d/b/a Barron's Exxon Service Center, was the alleged non-manufacturer seller of the battery. There is some evidence which indicates he sold the battery new to Mrs. Hudgens' son (plaintiff's stepson) *945 three days before the accident and installed it in the son's 1965 or 1968 (the record is unclear) Chevrolet where it performed satisfactorily until shortly before the accident.
After trial, the court granted a motion for a directed verdict in favor of this defendant because he "only handled the battery and did nothing." We affirm.
Even if we assume that the battery was defective (which we ultimately decided it was not), the record is devoid of any evidence tending to show that Troy Barron knew or should have known that the battery was defective. It is settled in Louisiana that the non-manufacturer seller of a defective product is not responsible for damages in tort, absent a showing that he knew or should have known that the product sold was defective. Reeves v. Great Atlantic & Pacific Tea Company, Inc., 370 So.2d 202 (La.App. 3rd Cir. 1979), writ denied 371 So.2d 835, and cases cited therein. Hence, we affirm the district court's granting of a motion for a directed verdict in favor of defendant Troy Barron.

DECREE
For the above and foregoing reasons the judgment of the district court dismissing plaintiff's claims against all defendants is affirmed. Costs of this appeal are assessed against the plaintiff.
AFFIRMED.
NOTES
[1] Plaintiff's wife, who was still in the car, did not witness the accident because the raised hood obstructed her view.
[2] The missing cap was never recovered. An identical cap was offered by defendants and was accepted into evidence.
[3] Globe Union, Inc. admitted that the battery herein was manufactured at its Dallas, Texas, facility in October of 1977.
[4] To support this assertion, Mr. Wilson told of some experiments his company had conducted to determine the feasibility of inserting a very thin blow-out panel that would direct the force of a battery explosion down, aside, or away from where a person would probably have been standing. Sections of the battery cover were cut out and replaced by standard weight Saran Wrap. The Saran Wrap was held to the battery by a grease film. The gases were then ignited. The speed and pressure of the combustion was so great that it shattered the entire cover rather than just blowing the Saran Wrap off.
[5] Defendants introduced into evidence a Special Committee Report prepared by the Battery Council International (BCI), the battery industry trade organization. The Report was prepared in 1974 after work sessions between BCI and the Consumer Products Safety Commission were conducted. The purpose of those sessions was to establish suggestions and examples as to how BCI could comply with the current laws, which were also outlined in the Report.