435 So.2d 507 (1983)
ELMWOOD PLANTATION, INC.
v.
RUUD WATER HEATER DIVISION, CITY INVESTING COMPANY, et al.
No. 82-CA-233.
Court of Appeal of Louisiana, Fifth Circuit.
June 22, 1983.
*508 John J. McCann, James A. McCann and Paul Mirabile, McCann, McCann & Mirabile, Thomas L. Giraud, Salvador M. Cusimano and Charles Verderame, Giraud, Cusimano & Verderame, New Orleans, for plaintiff-appellee.
Leonard Young, New Orleans, for intervenor-appellee.
Neville M. Landry, Thomas G. O'Brien, New Orleans, Ann Cynthia Diamond, New York City, for defendants-appellants.
Before CHEHARDY, BOWES and GAUDIN, JJ.
BOWES, Judge.
Defendants appeal a judgment of the district court finding them liable to plaintiff for property damage suffered in a fire at the Elmwood Plantation Restaurant in December of 1978. We affirm in part and reverse in part the judgment of the trial court.
At approximately 4:00 a.m. on the morning of December 18, 1978, a fire occurred at the Elmwood Plantation Restaurant (hereinafter Elmwood) in Jefferson Parish, Louisiana. Present in the restaurant at the time of the fire were Joseph Harris, a cook employed at the restaurant, his grandson, Charles Harris, and one other employee of Elmwood. Also present was Frank Serio, who was delivering dairy products to the restaurant. Mr. Serio told Joseph Harris that he smelled smoke and, upon investigation, Joseph Harris discovered the fire in a second floor storage room (known as the soap room). Immediately following this, the restaurant was totally destroyed by the fire.
The district court proceedings, by agreement of the parties, were properly bifurcated into two issuesliability and damages. The case presently before us is limited to the issue of liability of the defendants, Ruud Water Heater Division, City Investing Company, and LaMatt Agency, Inc. Various other defendants were originally named, but were dismissed from the suit prior to trial. Essentially, the issue at trial was whether the hot water heater, installed the previous year in the soap room, was the cause of the fire due to defective design or construction and/or improper and inadequate warnings and instructions for proper installation and use.
A Ruud Model GL37-200-5 hot water heater is the appliance in question. It had been installed on December 1, 1977, as a replacement for a Ruud Model GL37-156-5, which had ceased to function properly and which (model) was unavailable as its own replacement at the time. The new hot water heater was purchased from LaMatt Agency (a defendant-appellant herein) and installed by the regular plumber for Elmwood, Mr. Charles Manfre. Mr. Manfre and his employees all testified that a box-type draft diverter was delivered with the new hot water heater and that this box-type draft diverter was installed on the unit. Mr. Manfre further testified that he personally secured the fittings on the new heater and fired it to insure that it functioned properly.
The new heater, model GL 37-200-5, was installed in the same place as the old model, GL 37-156-5, had been, on a wooden floor covered by several sheets of aluminum already in place and a new aluminum sheet was added atop these. The old unit (Model GL 37-156-5) had produced 156,000 BTU's per hour. The new model GL 37-200-5 produced 200,000 BTU's per hour and was not accompanied by any warning that it should not be installed on a combustible surface. Neither was there any warning on either the water heater or the draft diverter supplied with the unit that only one type or model of draft diverter was suitable for use with the GL 37-200-5 water heater.
The employees of Elmwood mentioned above, who discovered the fire, testified that the fire was discovered in the soap room containing the hot water heater. Their testimony was buttressed by that of Roy Pete and Benjamin Graci, Jr., Jefferson Parish Fire Inspectors, and James Mazerat, Chief Arson Investigator for Jefferson Parish, all of whom were involved in the investigation, and all of whom testified that *509 the origin of the fire was in the floor directly beneath the Ruud heater in question. Their conclusion was reinforced by the testimony of Ralph Newell, a fire reconstruction expert retained by both insurance companies providing fire coverage to Elmwood. Newell testified as follows:
Q All right. Now, Mr. Newell, do you have an opinion as to how that situation that you just described, the oxidization on lower part of the legs of the heater, contributed to the fire in question?
A Yes, sir, there ismy opinion is over a period of time with the constant heat from the burners through the heat shield on the floor itself caused a pyrophoric carbon build-up.
Q And what is a pyrophoric carbon build-up? How does it occur?
A It's a result of what is known as pyrolysis. In other words, it's a chemical or resistance breakdown of the material due to heat exposure, bringing the materials flash point downward, or ignition temperature.
Q And what is the significance of that?
A In other words, for example, if a piece of wood was exposed to a steam pipe very close, or up against it over a period of time, the piece of wood's normal resistance to ignition, or its ignition temperature would keep lowering because of the chemical change taking place. The vapors are leaving the wood; it is dehydrating and things of that nature.
Q What happens after it gets dehydrated?
A Eventually, you are going to have combustion.
Q What type of combustion?
A Spontaneous combustion.
Q All right. Mr. Newell, is the problem of pyrophoric carbon a recognized problem in fire investigation?
A Yes, sir, it must be considered.
James Mazerat, the Chief of Arson Investigation for Jefferson Parish, found pyrophoric carbon in the flooring under the water heater and also concluded that heat from the burners of the water heater created the pyrophoric condition which resulted in the fire (Trans. Vol. IV, p. 246). He specifically stated that pyrolyzed wood was discovered under the metal pans determined to have been situated between the heater and the flooring.
Plaintiff next called Dr. Hans Fuehrer, who was accepted by the court as an expert in the fields of engineering and fire investigation. Dr. Fuehrer made a visual determination of the burn patterns and concluded that the fire began at the location of the Ruud heater. He explained how the box-type draft diverter installed on the heater prevented proper venting of the hot gases produced by the heater in operation, and resulted in an excessive build-up of heat in the flame box. He then opined how this excessive heat would be conducted to the floor both through the legs and out the front (of the flame box), effecting a transformation of that wood into pyrophoric carbon.
Plaintiff's final expert, Leonard Mandell, is a consulting engineer and forensic scientist with extensive credentials in the areas of thermodynamics, combustion, fire safety, fire investigation, and design of gas water heater systems. His qualifications as an expert in these fields were indisputable and overwhelming and were not questioned by defendants. Mr. Mandell not only examined the site of the fire and the actual heater which had been at Elmwood, but also performed extensive and precise tests on an identical model in his private laboratory. Based on his observations, he concluded that the fire was caused by the Ruud gas-fired water heater because: (1) the instructions and warnings supplied with the water heater were so inadequate from a fire safety standpoint as to make the unit defective and unsafe to operate on a combustible wooden floor in an alcove or attic, due to the unanticipated heat production discharged to the floor beneath the heater; (2) the absence of any instructions dealing with the critical necessity of proper venting; (3) the failure of the draft diverter to *510 properly direct and discharge the hot gases emanating from within the heater; and (4) the lack of proper insulation in the combustion chamber of the water heater.
Specifically, he measured temperatures of hot gases coming from the rear air slot of the combustion chamber located 3 to 4 inches above the floor surface at some 600 degrees Fahrenheit. This "intolerable" and unsafe level of heat was, in Mandell's opinion, due to an inherent defect in the heater itself, as well as improper and insufficient ventilation.
In his "Reasons for Judgment", the learned trial judge "noted that temperatures of 400 degrees to 700 degrees F. on a continuous basis cause a pyrophoric condition at which time the wood changes into a substance which resembles highly-flammable charcoal." We find that this statement is slightly inaccurate in that the preponderance of the testimony and evidence presented at trial establishes that the process of changing wood into pyrophoric carbon begins at temperatures as low as 180 degrees F. (We note that due to the voluminous and highly-technical nature of most of the testimony and evidence, the trial judge's confusion on this point is quite understandable). However, there can be no doubt but that the wooden floor directly below the Ruud hot water heater was exposed to temperatures well above 180 degrees Fahrenheit for long and successive periods of time. Consequently, we find no manifest error in the trial court's conclusion that the Ruud Model GL37-200-5 was defective inasmuch as the high temperatures reached at the base of the unit made it unreasonably dangerous for use on a combustible surface, that these temperatures created the pyrophoric condition in the floor, and that this pyrophoric condition caused the fire at Elmwood.
At trial, defendants attempted to prove that a "cone-shaped" diverter was designed for and packaged with the heater, and that the box-type diverter was improperly installed. Evidently, we are meant to conclude that the cone-shaped diverter would have prevented the accumulation of excessive heat, as discussed above. On the record before us, we cannot ascertain with a fair degree of certainty whether the recommended device was supplied with the unit by LaMatt, or whether the improper type diverter was substituted by them for some reason; or even if the box-type diverter was supplied by the plumber. The testimony is conflicting. The trial judge is invested with great discretion in evaluating the credibility of witnesses, and his evaluation should not be disturbed in the absence of manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973). We cannot say that the court's conclusion, that the box-type diverter was supplied by LaMatt in separate packaging, was erroneous.
However, we find that such question as to supply and use of the box-type diverter is insignificant for two reasons. First, the diverter used was not packaged with any warnings that it was unsuitable or inadequate for use with a GL37-200-5. Further, the box-type diverter fit the heater without modification. There was testimony indicating that either the heater or diverter could have been manufactured at negligible cost so as to prohibit a proper fitting and thus prevent inadvertent exchange or substitution. Thus "an ounce of prevention" on Ruud's part would certainly have been worth more than "a pound of cure."
Secondly, the testimony of plaintiff's expert witnesses, in particular, Mr. Mandell, establishes to our satisfaction that the major contributing factor to the excess heat radiation at the base of the heater was the lack of insulation of the combustion chamber. Mr. Mandell stated that to provide sufficient thermal resistance to reduce the temperatures along the bottom of the combustion chamber to underneath two hundred degrees Fahrenheit, an acceptable level, would have cost Ruud less than one dollar!
Accordingly, we agree with the district court in its findings that the Ruud Model GL37-200-5 was defective in its design so as to make it unreasonably dangerous to normal use on a combustible surface.
*511 The testimony of the witness for the defense neither rebutted the opinions of plaintiff's witnesses nor set forth any alternate theory of how the fire could have started. Further, the experts for the defense did not find it necessary to conduct any tests of their own, but rather chose to rely solely on Ruud's claim that its product met all industry standards. The meeting of industry standards does not absolve Ruud from liability, for the Louisiana Supreme Court has stated:
A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.... [citations omitted].
If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them.
Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (La.1971)
Appellants, in their briefs, contend that "the trial Court's findings that the Ruud heater created and ignited a pyrophoric condition in the wood floor at Elmwood are contrary to a preponderance of the evidence and to established and universally-accepted scientific fact."
This argument is based upon appellants' reading and interpretation of 125 pages of technical literature submitted by plaintiff in its trial memorandum, but never introduced into evidence at the trial.
We disagree with appellants for two reasons. Although the photocopies of the literature are, in fact, part of the record before us, we cannot say that such constitutes a preponderance of the evidence. It does not actually constitute evidence at all. The articles are highly-technical and subject to various explanations and interpretations. Neither appellants nor this Court has the expertise or specialized knowledge necessary to analyze the applicable scientific concepts embodied in the literature and to apply the same to the facts of this case. Such is the function of expert witnesses. Defendants' witnesses were not offered to explain the articles; moreover, the testimony elicited by defendants from Mr. Mandell on cross-examination does nothing to bolster defendants' claim.
Under the circumstances, for this Court to consider the experimental studies referred to by defendants would effectively amount to a re-trial of the case. The basic premise of appellate review necessarily involves a reconsideration of the factual conclusions, reasonable evaluations of credibility and inferences of fact, reasonably supported by credible evidence in the record. See Canter v. Koehring, supra; see also Dyson v. Gulf Modular Corp., 338 So.2d 1385 (La.1976).
An appellate court is simply not free to substitute its own version of the facts, however reasonable it may be, for that found by the trial court, unless the lower court committed manifest error by finding facts not reasonably supported by credible evidence in the record.
Dyson, supra [citations omitted]
The trial judge had before him the scientific treatises by virtue of plaintiff's memorandum and we must presume he took them into account, for whatever value he found in them, if any, in rendering his judgment.
As a reviewing court, we are constitutionally bound to review both the facts and the law found and applied by the trial court. A review, by definition, is not a new view of the facts and the law of a particular case; it is a judicial (and hopefully, judicious) reexamination by a higher court of facts and law already viewed by a lower court. In brief, we *512 review, not re-try. As an appeal court, we do not hold a second trial of a case each litigant is entitled only to his own "day in court."
Thus, as reviewer, we are not to find facts anew; we are not to substitute our version of facts for the trial court's version. Rather, our function is to review the facts as found by the trier of fact in order to determine whether they are reasonably supported by credible evidence in the record. When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a rational factual basis for his finding, we should not, and do not, disturb this finding.

Mitchell v. Sigrest, 345 So.2d 141 (La. App. 1st Cir.1977)
We, too, are persuaded by the same reasoning that for us to examine the technical literature and try to apply it to the facts of this case would be beyond the scope of appellate review and constitute, essentially, a re-trial of the matter. The trial court's findings regarding the cause of the fire are more than reasonably and amply supported by overwhelming credible evidence.
Defendants' specification of error number 4 is: "Since the defendants did not have a meaningful opportunity to obtain expert testimony rebutting the opinion Plaintiff's expert gave at trial based on tests conducted after pre-trial discovery had been completed, the District Court erred in denying Defendants' Motion to disallow the evidence of that opinion."
The testimony at trial reveals that the defendants were informed, through the deposition of Mr. Mandell approximately two weeks prior to trial, of the basis of Mandell's opinion as to the negligence of Ruud in the design of the water heater. (Inasmuch as the deposition was not offered into evidence, we base our conclusions on statements made by Mandell at trial.)
At the termination of that deposition, Mandell was authorized to purchase an identical heater and perform the tests of which defendants complain. It is not clear from the record whether or not defendant Ruud was aware that the tests were actually being conducted. However, it is obvious from the transcript of the motion to strike the evidence that this defendant was aware for some time that plaintiff was seeking a water heater on which to perform such tests. Defendant Ruud's representatives, as well as defense counsel, attempted to locate such a heater.
Next, plaintiff points out that defendant did not object to any of the testimony regarding the tests made, and such failure constitutes a waiver of further objections. We find that defendants' advance knowledge that plaintiff intended to make such tests, as well as their failure to object, bars them from raising any objections at this point. The tests in question ultimately gave substance to Mandell's theory and opinion previously disclosed to defendants; therefore, we hold that defendants were not unduly surprised or prejudiced by admission of such evidence.
Finally, we consider defendants' fifth specification of error: "The District Court erred in holding LaMatt Agency, Inc., liable in the absence of any evidence that LaMatt knew of any vice of the water heater it sold."
It is settled in Louisiana that the non-manufacturer seller of a defective product is not responsible for damages in tort, absent a showing that he knew or should have known that the product sold was defective. Reeves v. Great Atlantic & Pacific Tea Company, Inc., 370 So.2d 202 (La.App. 3rd Cir.1979), writ denied 371 So.2d 835, and cases cited therein.
Hudgens v. Interstate Battery Systems of America, Inc., 393 So.2d 940 (La.App. 3rd Cir.1981)
There is no evidence in the record before us that LaMatt knew or should have known of the defects in the water heater and we note that the judge gave no reason for casting LaMatt in judgment. Moreover, the failure of the manufacturer to provide sufficient warnings and instructions with the heater and the diverters in question (which was proven at trial) serves to absolve *513 LaMatt of any liability for damages. This is true whether or not LaMatt supplied the improper diverter, since there was no reasonable way for LaMatt to know of the danger inherent in the design of the Ruud heater.
For the foregoing reasons, the judgment of the trial court that Ruud Water Heater Division, City Investment Company, is liable in damages to the plaintiff is affirmed.
That portion of the judgment finding LaMatt Agency liable to the plaintiff is reversed; this case is remanded to the trial court for the taking of evidence with regard to the question of damages owed to plaintiff. All costs of this appeal are to be borne by appellant Ruud.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.