815 F.2d 1016
 ELMWOOD PLANTATION, INC., Plaintiff,
Walbrook Insurance Co., Ltd., Intervenor-Appellant,
v.
RUUD WATER HEATER DIVISION, Defendant,
National Union Fire Insurance Co. of Pittsburgh, Pa.,
Intervenor-Appellee.
 No. 86-3090.
 United States Court of Appeals,
Fifth Circuit.
 May 1, 1987.
 
 Kevin O'Bryon, Donald A. Hammett, New Orleans, La., for intervenor-appellant.
 Dermot S. McGlinchey, Eve Barrie Masinter, New Orleans, La., for intervenor-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before CLARK, Chief Judge, WISDOM and HIGGINBOTHAM, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This is a suit between a primary and an excess insurer. The issue is whether a primary insurer is obligated to contribute to a settlement an amount in excess of its policy limit where the settlement is in lump sum form, and where the primary and excess insurers made no separate agreement to allocate specific portions of the lump sum to payment of the plaintiff's judicial interest, court costs, and attorneys' fees. The primary insurer refused to contribute more than its $1,000,000 policy limit to the $4.5 million dollar settlement. The excess insurers, wishing to conclude a settlement, paid $3.5 million of the $4.5 million settlement amount under protest. One of the excess insurers then sued the primary insurer to recover amounts it alleged were rightfully owed by the primary insurer. The district court held that the primary insurer discharged all of its obligations to its insured and that the excess insurer failed to prove that it paid any amount rightfully owed by the primary insurer. We affirm.
 
 I.
 
 2
 On December 17, 1979, Elmwood Plantation Inc. filed a product liability/redhibition suit in Louisiana state court against Ruud Water Heater Division and others. The suit alleged that the fire which destroyed the Elmwood Plantation Restaurant was caused by a defective water heater manufactured by Ruud. The trial judge bifurcated the case for separate trials on the issues of liability and damages.
 
 
 3
 After a bench trial on the issue of liability, the trial judge rendered judgment in favor of Elmwood against Ruud and the LaMatt agency, a retailer. The Louisiana Fifth Circuit Court of Appeal affirmed the determination of liability as to Ruud, but reversed the judgment against the LaMatt agency.[1] At this point, September 1982, Elmwood sent a demand letter to compromise all claims for $9,500,000; the insurers came back with an offer of $2,200,000. In July 1983 the trial began but stopped before Elmwood completed presentation of its evidence on the issue of damages. The parties entered into a consent judgment holding Ruud liable for $4,500,000. The judgment made no provision for interest, costs or attorneys' fees; rather, it provided for one lump sum payment.[2] The parties agreed that neither would appeal the judgment or seek to have it altered and that neither would seek costs. The agreement/judgment resolved all claims asserted by Elmwood against Ruud. A consent order executed the same day designates the sum each insurer agreed to contribute and contained a reservation of rights to litigate certain issues with each other. This order, like the consent judgment, has no provision for the payment of prejudgment interest, costs, or attorneys' fees. Walbrook reserved the right to litigate the issue of "costs and expenses of litigation"; National reserved all its rights against Walbrook.
 
 
 4
 At the time of the fire, Ruud carried liability insurance with several insurers. National Union Fire Insurance Company ("National") is the primary insurer; its policy limit is $1,000,000. Walbrook Insurance Company Ltd. had an 80 percent participation in excess umbrella coverage of $5,000,000.[3]
 
 
 5
 Because of their financial stake, Ruud's insurers were observers in the proceedings between Elmwood and Ruud. They agreed that $4,500,000 would be a reasonable settlement amount, but did not agree on how much each should contribute to the settlement. Walbrook, the excess insurer, took the position that, although the judgment would be in the form of a lump sum payment, that sum would include payment of Elmwood's court costs, attorneys' fees, and pre-judgment interest, in addition to damages. Accordingly, Walbrook demanded that National contribute to the settlement its pro-rata share of pre-judgment interest, costs, and attorneys fees, in addition to its policy limit of $1,000,000. In response, National argued that the consent judgment was a settlement, not a judgment after trial to which costs, attorneys' fees, and judicial interest might be added. Additionally, National argued that it would not have been liable for any pre-judgment interest or attorneys' fees in any case because National's policy did not provide for payment of those items.
 
 
 6
 Elmwood and Ruud were ready to settle, but Ruud would not settle unless its insurers were prepared to pay the settlement. Both National and Walbrook agreed that $4,500,000 was a reasonable amount, and they were both willing to put aside their dispute, for a time, because they favored a settlement. National paid $1,000,000--its policy limit--and Walbrook paid $3,500,000.
 
 
 7
 Walbrook petitioned to intervene in the state court suit to recover from National that portion of the settlement National allegedly owed. National then removed the intervention action to federal court on the basis of diversity jurisdiction.
 
 
 8
 The district court denied Walbrook's claim because of its failure to prove that it had paid a sum that National rightfully owed. The court found also that National discharged all of its obligations as Ruud's primary insurer.[4] We agree.
 
 II.
 
 9
 Walbrook's claim is based on third party performance and legal subrogation, which arise under Articles 1855 and 1829 of the Louisiana Civil Code.[5] Article 1855 provides that:
 
 
 10
 Performance may be rendered by a third person, even against the will of the obligee, unless the obligor or the obligee has an interest in performance only by the obligor.
 
 
 11
 Performance rendered by a third person effects subrogation only when so provided by law or agreement.
 
 
 12
 Article 1829 provides, in pertinent part, that:
 
 
 13
 Subrogation takes place by operation of law:
 
 
 14
 * * *
 
 
 15
 (3) in favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment ...
 
 
 16
 Thus, under Articles 1855 and 1829(3), legal subrogation takes place only if Walbrook paid a debt that National owed.
 
 
 17
 The National policy issued to Ruud provides that National will pay, in addition to its $1,000,000 limit:
 
 
 18
 ... All expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment which accrues after entry of the judgment and before the company has tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon (emphasis added).
 
 
 19
 Under this policy, National is obligated to pay on behalf of its insured only those costs "taxed against the insured", plus any post-judgment interest that accrues on the amount of the judgment. Louisiana law, however, holds a primary insurer additionally liable for a proportionate share of any pre-judgment interest assessed against its insured regardless of any contrary policy provision and regardless of whether an excess policy is in effect.[6] Thus, had Elmwood obtained a judgment after trial in excess of one million dollars against Ruud, National would have had to pay, in addition to its liability limit, any pre-judgment interest assessed on the amount of its policy limit. Because the Elmwood litigation was a suit in redhibition, Elmwood would have had the right to seek reasonable attorneys' fees if a judgment after trial had been rendered against Ruud.[7] It is not clear, however, that National would be required to pay Elmwood's attorneys' fees if assessed against Ruud. In any case, we need not decide that issue, because Elmwood's attorney's fees were not assessed against Ruud.
 
 
 20
 The Elmwood case was settled for a lump sum. As part of the settlement agreement, Elmwood surrendered its right to seek amendments to the judgment to secure attorneys' fees, interest, and costs. Upon receipt of the $4,500,000, Elmwood filed a satisfaction of judgment in the state court record. As agreed, Elmwood did not file a rule to tax costs or to assess legal interest or attorneys fees either before or after filing the satisfaction of judgment. No costs, interest, or attorneys' fees were ever assessed against Ruud in favor of Elmwood.[8] Accordingly, we fail to see how Walbrook paid any interest, court costs, or attorneys' fees to Ruud in satisfaction of a debt rightfully owed by National under either its policy or Louisiana law.
 
 
 21
 Whatever arrangement Elmwood made with regard to the distribution of the $4,500,000 lump sum settlement is not incorporated into the judgment, nor does the judgment reflect any prejudgment agreement among the insurers regarding allocation of the $4,500,000.[9] That there were pre-settlement discussions among Elmwood, Ruud, and the insurers regarding the possible outcome of the case were it actually tried to judgment, and that those discussions included consideration of possible awards of court costs, attorney fees, and legal interest in order to determine the settlement value of the case is irrelevant. Those discussions did not result in either a settlement agreement between Elmwood and Ruud or a prejudgment agreement among the insurers allocating the $4,500,000 in any specified way.
 
 III.
 
 22
 On appeal, Walbrook argues that a primary insurer has a good faith obligation to pay its policy limit plus judicial interest and costs even where, as here, a case against its insured is concluded by settlement rather than judgment after trial. We disagree.
 
 
 23
 In support of this contention, Walbrook relies on Hodge v. American Fidelity Fire Insurance Company.[10] Hodge is not apposite. In Hodge, as in the present case, the insured risked a probable judgment in excess of the primary policy limit. It was also clear that the primary insurer would have been cast for judicial interest and costs if the case had gone to trial and judgment had been rendered against its insured. The primary insurer, however, refused to settle for its policy limit plus judicial interest and costs, necessitating a trial. A judgment after trial was rendered in excess of the primary policy limit. The court held the primary insurer liable for the entire judgment because, in failing to settle for its policy limit plus costs and judicial interest when a judgment in excess of the policy limit was certain, the primary insurer breached its duty of good faith to the insured. That duty required the primary insurer to minimize its insured's exposure to damages.
 
 
 24
 We read Hodge as limited to the situation in which a primary insurer fails to settle a case. Only then does an insured risk a judgment in excess of a plaintiff's settlement offer. National did not fail to settle Elmwood's claim against its insured; National simply refused to contribute to the settlement any amount above its $1,000,000 policy limit. This refusal did not lead to a failure to settle the case. Thus, unlike the insured in Hodge, neither Ruud nor its excess insurers risked a judgment in excess of the amount for which Elmwood agreed to settle.
 
 
 25
 The precise issue posed is whether, in addition to paying its liability limit, a primary insurer has the obligation to contribute to a lump sum settlement an amount representing its share of judicial interest, costs, and attorneys' fees that might be assessed if a judgment had been rendered against its insured when the primary and excess insurers did not agree to apportion part of the settlement as representing payment of the plaintiff's attorneys' fees, prejudgment interest, and costs. In the absence of an agreement stating that specific portions of a lump sum settlement represent payment of the plaintiff's judicial interest, costs, and attorneys' fees, we hold that no such obligation exists.
 
 
 26
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 See Elmwood Plantation, Inc. v. Ruud Water Heater Division, City Investing Company, 435 So.2d 507 (La.App. 5th Cir.1983)
 
 
 [2]
 Indeed, Elmwood conditioned acceptance of the 4.5 million dollar figure upon the settlement being in lump sum form. This was to minimize tax consequences. Any of the 4.5 million dollars attributable to interest would have been taxable as ordinary income to Elmwood
 
 
 [3]
 California Union Insurance Company has the other 20 percent and paid $700,000 of the judgment. Because California Union is not a party to these proceedings, we need concern ourselves only with Walbrook and National
 
 
 [4]
 Elmwood Plantation, Inc. v. Ruud Water Heating Div., 623 F.Supp. 387 (E.D.La.1985)
 
 
 [5]
 Formerly Article 2161 and Articles 2134, 2136, and 2137, respectively, of the Louisiana Civil Code
 
 
 [6]
 Soprano v. State Farm Mutual Automobile Insurance Co., 246 La. 524, 165 So.2d 308 (1964); Travelers Indemnity v. Certain Underwriters at Lloyds, London and Companies, 566 F.Supp. 267 (E.D.La.1983)
 
 
 [7]
 See Philippe v. Browning Arms Co., 395 So.2d 310, 318 (La.1981)
 
 
 [8]
 Walbrook argues that it should recover against National to the extent that it paid National's costs and pro-rata share of judicial interest on two judgments that were rendered against Ruud in favor of Elmwood's subrogated fire insurers. Walbrook is not claiming that it paid any amount directly to the fire insurers. Rather, Walbrook argues that some of the amount it paid to Elmwood under the settlement was paid, in turn, by Elmwood, to the fire insurers. It is true that judgments after trial on the issue of liability were rendered in favor of Elmwood's subrogated fire insurers against Ruud. The consent judgment settlement, however, required Elmwood, not Ruud, to pay those judgments even though the consent judgment settlement required that payment come "out of the proceeds of the 4.5 million dollars". It thus appears that the debts reflected by those judgments were subsumed within and settled as part of the overall settlement of the case
 
 
 [9]
 One exception exists. The consent judgment contains an order requiring Elmwood to pay, out of the 4.5 million dollars, two judgments previously assessed against Ruud in favor of its subrogated five insurers. As footnote 8 notes, this is unimportant because ultimately, those judgments were not assessed against Ruud
 
 
 [10]
 486 So.2d 233 (La.App. 3rd Cir.); cert. denied, 489 So.2d 917 (La.1986)