h SULLIVAN, Judge.
This ease arises out of a forklift accident which occurred on July 6, 1985, in which the forklift operator, Jeffrey Johnson, was injured. Jeffrey and his wife Colleen, the plaintiffs, filed suit against the manufacturer of the forklift, Lull Enterprises, Inc. (Lull), and the owner of the forklift, Hy-Reach Equipment Company, Inc. (Hy-Reach), the defendants. The jury found in favor of Lull and Hy-Reach. The Johnsons appealed.
While this appeal was pending, Lull filed for bankruptcy in the United States Bankruptcy Court for the District of Minnesota and for an automatic stay of proceedings in this court under 11 U.S.C. § 362. On motion of the Johnsons, this court ordered that the appeal as to Hy-Reach be placed on the docket and heard in due course since Hy-Reach was not covered by the automatic stay provided for in 11 U.S.C. § 362.
RFACTS
On July 6, 1985, Jeffrey was injured while operating a Lull Highlander 844 rough terrain forklift in the course and scope of his employment. Rough terrain forklifts are for use on unimproved surfaces such as construction sites.
At the time of the accident, Jeffrey was employed by Frank Snodgrass, d/b/a D & F Construction Company (D & F), who had subcontracted with the general contractor, Hunt Construction Company, to build a complex of housing units at the Fort Polk Army base near Leesville, Louisiana. He was using the forklift to set trusses on top of the two story housing units when the forklift laterally overturned onto its left side. Jeffrey’s leg was crushed by the overhead protection device of the forklift.
Subsequently, the Johnsons filed suit against Lull, the manufacturer of the forklift, and Hy-Reach, the owner of the forklift who leased it to D & F. The jury found in favor of the defendants, indicating in their interrogatory that they found Jeffrey one hundred percent at fault in causing his accident. The Johnsons appealed.
Due to the continuing stay order as to Lull, we will address the assignments of error only as they pertain to Hy-Reach. The Johnsons’ assignments of error pertain to the jury’s finding that the forklift was not defective and that the accident was caused by victim fault, the jury instructions regarding victim fault and striet liability, and the admission into evidence of Jeffrey’s medical records relating to his hospitalization for substance abuse and the cross examination of Jeffrey regarding his hospitalization and drug use.
We have reviewed the case and find no merit to the plaintiffs’ assignments of error. The jury’s verdict is affirmed.
I a JURY INSTRUCTIONS
The Johnsons alleged that the trial court gave erroneous instructions on the liability of a distributor or lessor of machinery and on victim fault in a products liability action. Normally, deference must be given to the jury verdict and our review is performed using the manifest error or clearly wrong standard. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). However, where jury instructions are found to be so incorrect or inadequate as to preclude the jury from reaching a verdict based on the relevant law and facts the manifest error standard does not apply. In such a case, we perform a de novo review. Creel v. S.A Tarver & Son Tractor Co., 537 So.2d 752 (La.App. 1 Cir.1988). In order to determine the appropriate standard of review, we initially consider these assignments of error which relate to the jury instructions.
Mere discovery of an error in the trial judge’s instructions does not in itself justify an appellate court conducting a de. novo review. First, the court must measure the gravity or degree of error and consider the instructions as a whole and the circumstances of the case. Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App. 3 Cir.1985), writ denied, 480 So.2d 738 (La.1986); Lincecum v. Missouri Pacific R. Co., 452 So.2d 1182 (La.App. 1 Cir.), writ denied, 458 So.2d 476 (La.1984). “The adequacy of a jury instruction must be determined in light of the jury instructions as a whole.” Laborde, 474 So.2d at 1324. Adequate jury *407 instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. Futrell v. Scott Truck and Tractor Co., 629 So.2d 449 (La.App. 3 Cir.1993), writ denied, 94-0327 (La. 3/25/94); 635 So.2d 232.
|4In addition, we must consider whether the Johnsons properly preserved their objections to the jury instructions. La.Code Civ.P. art. 1793 mandates the proper method for objecting to jury instructions. In particular, part (C) provides:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to. make the objection out of the hearing of the jury.
Prior to the retirement of the jury, the Johnsons objected to the following instruction:
A distributor of a product or piece of machinery, who neither designed nor manufactured the equipment, as is the position contended by Hy-Reach, cannot be held liable for any defect, unless the plaintiff shows that at the time of the sale or distribution the distributor had knowledge of the defect. (Hudgens v. Interstate Battery, 393 So.2d 940, 945 (3rd Cir.1981)).
The Johnsons argued that this instruction was not a proper statement of the law be-, cause Hy-Reach could also be held strictly liable pursuant to La.Civ.Code art. 2695. On appeal, the Johnsons allege as error the giving of this instruction. However, in their supplemental brief filed on March 31, 1995, the Johnsons argue for the first time in this case that this instruction was improper because Hy-Reach could have been held strictly hable under La.Civ.Code art. 2317. At trial, the Johnsons neither requested that the jury be instructed on La.Civ.Code art. 2317, nor did they specifically argue that Article 2317 might be applicable to this case when making their objection. “Specific objections [to jury instructions] and the grounds therefor are required to allow the trial court a fair opportunity to correct any erroneous or improper charges before the jury deliberates.” Luman v. Highlands Ins. Co., 25,445 at p. 5 (La.App. 2 Cir. 2/23/94); 632 So.2d 910, 914 citing Schoonmaker v. Capital Towing Company, 512 So.2d 480 (La.App. 1 Cir.), writ denied, 514 So.2d 458 (La.1987). The issue of Article 2317 was raised for the first time on appeal and thus, was not properly preserved at trial [1] Therefore, we need not consider plaintiffs argument with regard to Article 2317 and, instead, restrict our discussion to the alleged applicability of Article 2695.
In their original brief, the Johnsons argued that the trial judge erred in refusing to instruct the jury that Hy-Reach, as lessor of the forklift, could be found strictly liable under La.Civ.Code art. 2695, which does not require knowledge of the alleged defect on the part of the lessor.
La.Civ.Code art 2695 provides:
The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.
This article’s strict liability is an incident of the parties’ contractual relationship. It arises because the contract of lease contains implied warranties that the leased property is not defective and is fit for its intended use. Hall v. Park Dell Terrace Partnership, 425 So.2d 372 (La.App. 3 Cir. 1982), appeal after remand, 452 So.2d 342 (La.App. 3 Cir.1984); Han v. Favrot & *408 Shane Properties, 615 So.2d 389 (La.App. 5 Cir.), writ denied, 617 So.2d 910 (La.1993). The application of Article 2695 is restricted to the lessor/lessee relationship and does not apply to third parties whose rights are protected by other articles including 2315, 2317, 2322, and |6660. Franklin v. Ford Motor Corporation, 617 So.2d 57 (La.App. 4 Cir.1993). The contract of lease was between Hy-Reach and D & F. Jeffrey, an employee of D & F, was a third party to the contract. Therefore, since Jeffrey could not recover under Article 2695, the trial judge did not err in failing to charge the jury on Article 2695 strict liability.
The Johnsons also argue that the trial judge erred in instructing the jury on victim fault as it applied to strict liability. The jury was properly instructed that Hy-Reach could not be found strictly liable in this case. Accordingly, any error in the jury instruction relating to victim fault as it applies to strict liability is harmless and does not require that the jury verdict as to Hy-Reach be overturned or that this case be subject to a de novo review.
EVIDENCE
The Johnsons alleged that the trial judge erred by admitting into evidence medical records of Jeffrey’s hospitalization for the treatment of substance abuse and by allowing cross examination of Jeffrey on the contents of the medical records. When these records were offered into evidence, the Johnsons objected on the ground that the prejudicial nature of the records outweighed their probative value. This objection was obviously based on La.Code Evid. art. 403.
In brief, the Johnsons argued that the trial judge improperly admitted these medical records pursuant to La.Code Evid. art. 609 and that the admission violated the physician-patient privilege. The following exchange occurred when the records were offered into evidence:
BY MR. ROY:
... Following a pre-trial in the Judge’s office, if the court is going to allow testimony about prior convictions and statements, whatever, to doctors, then we’re going to object — make a general objection, especially on the basis of |7Johnson Trial Number One, — where he got a parole pardon.
BY THE COURT:
Very well. Just for the record, I’ll ...
BY MR. ROY:
And we claim it’s highly prejudicial and the probative value is not served at all by this type of evidence.
BY THE COURT: ■
All right. I considered this in chambers, but under 609 of the Louisiana Code of Evidence, I feel it is admissible, particularly in view of the testimony that he gave on direct, and I won’t go into details, and under the comments, Sub-paragraph C under the comments, which according to that the — that Sub-paragraph C, defective part or annulment, is applicable to this one.
From this exchange, it is apparent that the trial judge’s reference to Article 609 concerned the evidence of Jeffrey’s conviction, Johnson trial exhibit number one, and not Jeffrey’s medical records. Article 609, in pertinent part, allows the admission in civil eases of the name of the crime and the date of the conviction to attack the witness’ credibility in limited circumstances. Clearly, this article did not form the basis for admission of the medical records.
The specific issue of privilege as to conversations between Jeffrey and his health care provider was never raised at trial, except insofar as plaintiffs’ counsel objected generally, based on La.Code Evid. art. 403, that the prejudicial nature of such evidence outweighed its probative value. Therefore, the specific privilege violation claim was not properly preserved for appeal. In any event, even had the issue of privilege been properly raised, La.R.S. 13:3734(0(3), which was in effect at the time of trial, provided that there shall be no privilege when a person brings an action to recover damages for personal injuries in tort or for worker’s compensation 18under either federal or state law[2]. There *409 fore, the admission of this evidence did not violate the physician-patient privilege.
Although such drug treatment evidence was otherwise admissible and relevant to both Jeffrey’s credibility and the severity of his past drug use, we must determine whether the admission of the drug treatment medical records unfairly prejudiced plaintiffs’ case. In this regard, La.Code Evid. art. 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
The issue of Jeffrey’s alleged drug use at the time of the accident was raised at trial. The authorities arrested Jeffrey on May 3, 1985 after finding marijuana plants that he was growing. On May 5, 1985, Jeffrey commenced treatment for drug addiction at St. Patrick Hospital in Lake Charles, Louisiana. His treatment ended on June 1, 1985, approximately one month before the accident on July 6, 1985.
In his testimony, Jeffrey denied using drugs after his release from the hospital on June 1, 1985 and claimed to be drug free at the time of the accident. When questioned about his drug use prior to treatment, Jeffrey replied that he smoked approximately one marijuana joint per day prior to treatment. The medical records were then used to show that Jeffrey had told his treating health care provider at St. Patrick’s Hospital that he had a five joint a day habit before entering treatment. The question of drug use was relevant to the issue of causation of the accident. The medical records were properly used for impeachment purposes to show the severity of Jeffrey’s prior use and to attack his credibility on the frequency of that use. Also Las impeachment evidence, the records were relevant to help the jury determine if Jeffrey was being truthful in claiming no drug use at the time of the accident. It should be noted that the drug treatment records also contained evidence relatively favorable to Jeffrey, such as that he worked diligently in his treatment program. For these reasons, we do not find that the prejudicial nature of this evidence outweighed its probative value. Therefore, the trial court did not err in admitting the hospital records into evidence.
JURY VERDICT
Finally, the Johnsons alleged that the jury verdict was clearly wrong in general, since the jury found that Hy-Reach was not negligent, and specifically, since the jury found that the forklift was not defective. The duty-risk analysis requires the presence of four factors to find a defendant negligent, to wit: (1) Was the conduct in question a cause in fact of the resulting harm? (2) What, if any, duties were owed by the respective parties? (3) Were the requisite duties breached? (4) Was the risk and harm caused within the scope of protection afforded by the duty? Faucheaux v. Terrebonne Consol. Govt., 615 So.2d 289 (La.1993). In any negligence action the issue of causation is the initial question to be considered by the trier of fact. Even in a ease where some negligence exists, without causation no liability is created and the negligence is not actionable. Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La. 1/14/94); 630 So.2d 1289.
Cause-in-fact is a factual question to be determined by the factfinder and a court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Theriot v. Lasseigne, 93-2661 (La. 7/5/94); 640 So.2d 1305. The court in Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993), set out a two-part test which an appellate court must satisfy in | morder to reverse a factfinder’s determinations of fact. The appellate court must review the record in its entirety and find the following:
1) that a reasonable factual basis does not exist for the finding of the trial court, and
2) that the factfinder is clearly wrong (manifestly erroneous).
In order to find that causation existed in this case, the jury needed to find that the lack of warning and/or the lack of a seat belt caused Jeffrey’s injuries. Jeffrey was an experienced forklift operator prior to *410 going to work for D & F. The Lull Highlander 844 originally sent to the job site from Hy-Reach’s Lake Charles, Louisiana office was equipped with a lap seat belt. Having worked on this particular job approximately five weeks prior to the accident, he was well aware that the Corp of Engineers required a seat belt to be worn when operating all heavy equipment. Jeffrey admitted that, while working on that Lull Highlander 844, he often failed to use the seat belt because he got on and off the machine approximately 75-80 times per day. Additionally, Jeffrey’s supervisor, Wayne Maley, testified that he had warned Jeffrey ten to fifteen times to put on his seat belt.
According to Mr. Maley, a day or so prior to the accident the “bearing burned out” on the original Lull Highlander 844. A new machine was ordered, which arrived from Hy-Reach’s Baton Rouge, Louisiana office late in the afternoon on Friday, July 5, 1986, without a seat belt. The Baton Rouge office was unaware that a seat belt was required. When informed that the seat belt was required, Hy-Reaeh told D & F that they would return the following Monday to put a seat belt on the forklift. Hy-Reach was not informed that construction was running one and a half to two weeks behind and that D & F would be working the next day, Saturday.
Jeffrey testified that on Saturday he was told to operate the Lull forklift without a seat belt. He was further instructed that if Corps of Engineers personnel came | naround he was to get off the machine so they would not see him operate it. The jury could have reasonably concluded that it was more probable than not that Jeffrey would not have been wearing the seat belt even if the replacement forklift had been equipped with one.
Alternatively, the jury could have reasonably found that wearing a seat belt would not have prevented Jeffrey’s injuries or, at best, would have only changed the type and not the severity of his injury. The jury heard Richard Baxter, the manager of engineering for Lull, testify that a study has shown in rollovers where seat belts are used serious leg injuries are still produced. Additionally, the jury heard testimony concerning forklift operators suffering head injuries while wearing seat belts which are caused by the acceleration of the operator’s upper body. This acceleration causes the operator’s head to impact the ground or the inside protective structure frame. This is sometimes referred to as the “flyswatter” effect. Although it was pointed out that these tests were done with anthropometric dummies and not humans, the plaintiff did not present any contradictory evidence. On the basis of this evidence, the jury could have reasonably found that use of a seat belt would have only changed the type of injury Jeffrey incurred and not the severity of his injuries. Therefore, the jmy could have reasonably found that the lack of seat belt in the forklift did not cause Jeffrey’s injuries.
Likewise, the jury could have found that Jeffrey would not have heeded the warning to stay within the overhead protection device even if it had been given. Of the nineteen warnings placed on the label, Jeffrey admitted failing to follow three of them. One of the warnings which he failed to follow stated that, when traveling with a load, always have transfer and boom retracted. Jeffrey admitted traveling 25-30 feet with the boom extended and fully loaded. On the basis of this evidence, the jury | ^could have reasonably concluded that Jeffrey would not have heeded the proposed warning to stay within the overhead protection device any more than he heeded the warning not to travel with the boom extended.
Alternatively, the jury could have found that since Jeffrey could not recall whether he had tried to jump from the forklift or not, that he actually tried to stay with the forklift but was unsuccessful. In this case, the lack of warning would not have been the cause of Jeffrey’s injuries.
Even if the lack of a seat belt or warning were found to be a cause of Jeffrey’s injuries, the jury still would have had to find that their absence constituted a defect. In its answer to interrogatories, the jury stated that it found no defects existed in the Lull Highlander 844 forklift at the time it left Lull’s care. That is, it was not unreasonably dangerous to normal use. When the forklift left Lull’s care, it had no seat belts or in *411 struction regarding staying -with the forklift when a lateral overturn occurs, the alleged defects complained of by the Johnsons. Since the forklift was in the same condition at the time of the accident, we can infer that the jury found that no defects existed at the time of the accident.
We now examine the reasonableness of this finding. The Johnsons argue that the warning decal placed on the forklift or its operator’s manual, which should have accompanied the forklift, should have contained an instruction stating that, in case of a lateral overturn, the operator should remain with the forklift within the confines of the overhead protective gear. The jury heard testimony from the experts on both sides on what is the appropriate action to take in the case of a lateral overturn. The expert for the defendants pointed out that in a rough terrain forklift, staying with the forklift may not always be the proper course of action. Unlike industrial forklifts which are designed to operate only on finished surfaces such as concrete, rough | ^terrain forklifts are designed to operate on unimproved work areas like the construction site in the present case. In addition to an uneven dirt surface, construction sites normally include piles of supplies, equipment of all shapes and sizes and unfinished construction areas out of which reinforcement bars and other objects protrude. In particular, the expert explained that, where objects protrude from the ground, the operator may need to exit the forklift to prevent his death or injury.
In Ingram v. Caterpillar Machinery Corp., 585 So.2d 723 (La.1988), which involved the lateral overturn of an industrial forklift, the court found that the manufacturer had a duty to warn the operator to stay with the forklift in the case of a lateral overturn. We find the present ease distinguishable from Ingram because it involves a rough terrain forklift, which operates on unimproved surfaces and unimproved surfaces present a different set of dangers from the finished ones.
The protruding objects scenario was also given as a reason for not installing seat belts as a rule, as suggested by the plaintiffs. The jury heard testimony that in such a case the operator in all likelihood would need to either adjust his position or exit the forklift. A seat belt would hinder this effort and increase the likelihood of injury and possibly death. There was additional testimony that an operator has a matter of seconds to decide on the best course of action and removing himself from the seat belt can take up those few moments. Considering this testimony, we cannot say that the jury was unreasonable in finding that no defects existed.
Finally, the jury found that Jeffrey was one hundred percent at fault in causing his injuries. Jeffrey was using the Lull Highlander 844 forklift to set trusses on the second story of a two story building. This budding was one of several buildings arranged in an elliptical pattern facing the inside of the ellipse. Equipment was in front of the building where Jeffrey needed to deliver the trusses. Therefore, he | ^delivered the trusses to the back of the building. The buildings were too close together for the trusses to be passed between without raising them above the buddings. No explanation was given as to why Jeffrey did not move the obstructions from the front to eliminate the need for him to travel to the rear with the trusses on the extended boom. The trusses Jeffrey was lifting were 30-36 feet wide and weighed approximately 125 pounds each. He carried eight of them at a time. Normally, the boom would be fidly retracted and the load carried approximately 1½ to 2 feet off the ground. Jeffrey had to extend the boom and travel in that position for 25-30 feet to reach the transfer point.
Jeffrey claimed that, upon reaching the back of the budding, he had completely stopped the forklift, retracted the boom, and then turned and proceeded to the spot where he was to lift the trusses to the second story. However, his coworker Harold Kaiama, who was waiting to receive the trusses, contradicted Jeffrey’s testimony. Mr. Kaiama testified that Jeffrey had boomed up approximately 20-22 feet with the trusses on the fork to clear the budding. In addition, Jeffrey’s forklift had to straddle a drainage ditch approximately six feet wide and eighteen inches deep located between the buddings. Mr. Kaiama said that, when Jeffrey got to the end of the budding, he started to *412 turn right without lowering the boom. He yelled at Jeffrey to lower the boom. However, Jeffrey did not hear. Mr. Kaiama explained that, as Jeffrey got to the end of the building, he never stopped. Rather, he immediately began his right turn. As he turned, the left wheels of the forklift were in the ditch and the trusses shifted over to the left. The top-heavy forklift then tipped over to the left. Considering this evidence, as well as the rest of the evidence, we cannot say that the jury was unreasonable in concluding that Jeffrey was one hundred percent at fault in causing his own injuries.
| isFor these reasons we find that the jury verdict was not manifestly erroneous or clearly wrong. Accordingly, we affirm the jury verdict.
DECREE
The trial court judgment is affirmed. Costs are assessed to plaintiffs-appellants, the Johnsons.
AFFIRMED.
SAUNDERS, J., dissents and assigns reasons.

. We note that, even had it been appropriate to give this instruction, the court's failure to do so ' would not have been reversible error. The jury found no defect in the forklift. Accordingly, the jury could not find that a defect caused Jeffrey’s injuries or the necessary elements of strict liability trader Article 2317.

. Although not in existence at the time of the trial, this issue is now also addressed in La.Code Evid. art. 510B(2)(a).