512 So.2d 480 (1987)
Ruth SCHOONMAKER, et al.
v.
CAPITAL TOWING COMPANY.
No. CA 86 0620.
Court of Appeal of Louisiana, First Circuit.
June 23, 1987.
Rehearing Denied August 26, 1987.
Writ Denied November 13, 1987.
*481 Mac Trelles and Partners, Mac Trelles, Dan Larpenteur and Hank des Border, Baton Rouge, for Ruth Schoonmaker, et al.
David M. Vaughn and David Guerry, Baton Rouge, for Dr. Lucas and State Farm Ins. Co.
Howard Murphy and Bert Cass, New Orleans, for Capital Towing Co.
Before GROVER L. COVINGTON, C.J., and LANIER and ALFORD, JJ.
GROVER L. COVINGTON, Chief Judge.
This is an appeal from judgment on the jury verdict in favor of defendant, Capital Towing Company (Towing Company) and against the plaintiffs, Ruth Schoonmaker, widow of George B. Schoonmaker, and her children, Billie S. Langlois, JoAnn S. Garland, Deanne S. Webb, Sienna S. McCarstle *482 and Kathleen S. Weems, in an action for wrongful death of George B. Schoonmaker.
Plaintiffs filed a supplemental petition naming as an additional defendant, State Farm Fire & Casualty Company, the liability insurer of the boat owner. Towing Company denied liability to plaintiffs and filed a third party demand against the owner-operator, Dr. James Lucas, and his insurer, for indemnity and contribution.
When the case came on for trial, after voir dire examination, the plaintiffs and State Farm notified the trial judge that they had entered into a compromise settlement. With the approval of all parties, including the plaintiffs, the trial judge announced this development to the jury. Plaintiffs' claim against State Farm was dismissed, and the trial proceeded only against the Towing Company.
The case was tried to the jury; and, after due deliberation, the jury returned a verdict in favor of Towing Company. In response to interrogatories on the issue of Towing Company's defense of contributory negligence and its third party demand, the jury found that Dr. Lucas and George B. Schoonmaker, the deceased, were each guilty of negligence of 50%. Judgment was entered on the verdict, and the plaintiffs perfected a devolutive appeal, specifying as error, the following:

(1)
The jury committed manifest error in finding, under the principles of comparative negligence, no fault whatsoever on the part of the operator of the M/V JANICE CAROL in contributing to and/or causing the collision with the Lucas outboard motor boat, and the resulting drowning of Mr. Schoonmaker.

(2)
The trial judge erred in his charge by giving repetitive, confusing, and misleading instructions to the jury.

(3)
The trial judge erred in advising the jury on two occasions during the trial that plaintiffs had settled with a party to the suit and compounded the error by advising the jury of the terms of the settlement.

(4)
The trial judge erred in commenting on the evidence during his charge to the jury.

FACTS
On the afternoon of November 26, 1982, George B. Schoonmaker and his friend, Dr. James (Jack) Lucas, embarked on a fishing trip from Morales' Landing on Grand River (Intracoastal Canal) in the parish of Iberville. They were in a small out-board motor boat owned and operated by Dr. Lucas. They knew before leaving the landing that the boat was having steering problems; the steering cables were stuck or impaired and the boat could not be turned properly. After trying without success to fix the steering problem, they embarked, with Schoonmaker manually steering the boat by turning the motor by hand and Dr. Lucas operating the throttle at the console of the boat. Dr. Lucas was wearing a life-vest, but Schoonmaker was not wearing one. They were going to Pat's Bay, a body of water off Grand River and on the other side (west) from Morales' Landing, in order to fish.
As they backed out of Morales' Landing and almost to the middle of the river, Dr. Lucas started going forward. He then saw the barges, which he called to Schoonmaker's attention. They thought the barges were headed directly toward them, so they tried to get out of the path of the barges by accelerating. The acceleration caused a sudden torque which caused Schoonmaker to lose control of the motor. The boat then turned back into the path of the barges rather than getting to their starboard side. The lack of speed and maneuverability of the small craft due to the impaired steering rendered the boat uncontrollable in the face of the oncoming barges.
Dr. Lucas testified:
Q. We're assuming you saw the barge because you said you did.
A. When I saw the tug the point was to get out of the way and we were headed straight for it. When I put it in speed, it went straight forward and so I let up. And so we could *483 make more room, more time, cutting and going to the side of the barge that way.
Q. As I appreciate your testimony, then, the bow of your boat at the time you gave it the gas would have been headed this way.
A. Yes.
Q. And then after you gave it the gas it continued in its downstream direction and then you let off of the throttle somewhat?
A. He (Schoonmaker) could turn it. He could turn the boat either right or left. He chose left and I was very much in agreement with that direction.
Q. In other words, then the boat was being turned over in the direction of Morales' Landing?
A. Right.
Q. But it was going very slow, was it not, Doctor?
A. It was going real slow as far as my feelings were concerned. But I guessed at the time of the deposition, which I did read over, that we were going five or so miles an hour and the maximum speed of that boat at full speed would be twenty-five or thirty we suggested.
Q. Well, had you had your steering system working, there would have been no problem getting across that canal to Morales' Landing, would there have been?
A. That's right.
Q. In other words, you could have made it over there without even coming close to this barge?
A. That's right.
Q. Dr. Lucas, did you ever give any signal to the tow that your bass boat was having a problem prior to the collision?
A. Not except the time I mentioned that I did put the paddle up to be sure he saw us.
Q. How close were you to the lead barge at that point?
A. I don't know the footage. But maybe as far as from here to he (sic) back of the room.
Q. Maybe about
A. Fifty feet, seventy-five feet, thirty feet. I don't know. But in the area I thoughtI couldn't see the tug and I was afraid he couldn't see us. That's why I put the paddle up and waved it like that, so he would be sure at least to know he was doing something to us.
Q. Up until that point, is my understanding correct, that you thought your boat was going to make it across?
A. Well, I was frantically trying to see that it would.
Q. What point of the barge made contact with what part of your boat, Dr. Lucas?
A. If you're looking at the operator's side, the front corner on the right.
According to Aubin, pilot of the tugboat, he first sighted the bass boat when his lead barge was 1,200 feet away and he had his tow positioned in the middle of the channel. As the lead barge moved to within 400 feet of the boat, Aubin sounded a fifteen-second whistle to alert the occupants of the boat and to show his intention to maintain his right-of-way. Aubin testified that he saw nothing to indicate that the boat's steering was inoperable or that a collision was imminent:
Q. Did you have any reason to believe that anything was out of the ordinary at this point in time, when the outboard is 400 feet from your bow?
A. Oh, no, sir. I hadn't receive (sic) any signal or anything from them.
Q. You hadn't received any signal from the outboard?
A. No, sir, none what (sic) whatsoever.
Q. What kind of signal were you expecting from the outboard?
A. Any kind of signal, sir.
Q. Like what, a whistle signal?
A. No, sir. If they would have waved their hands, if they'd even had an *484 irratic (sic) course or anything to give me an indication they weren't in control.
Q. So they didn't signal you in any way?
A. No, sir.
Q. Were you convinced, then, that they saw you and that they heard you at that point?
A. Yes, sir, I was.
Aubin, an experienced pilot, testified further that he did not think anything was amiss, even when the bass boat had drawn to within 200 feet of the lead barge:
Q. During the times that you've navigated tows on the Intracostal Waterway, have you met small boats like this particular boat?
A. Yes, sir, many times.
Q. And have you had occasion where those small boats come as close as what this one was to the front of your barge?
A. Oh, yes, sir. That was a very frequent occasion. It wasn't unusual at all. They're very highly manuevable (sic) and generally have a lot of speed, no problem.
Q. Did you have any indication at that particular time that this small boat had a steering problem?
A. No, sir, I had no indication.
Q. Did you have any indication in your mind at that time that this boat had an inoperable steering system?
A. No, sir, I did not. They were maintaining just a perfectly straight course, I thought they were perfectly well.
When Aubin saw that the bass boat was only deviating slightly from its head-on course, he reduced the speed of the tug by one-fourth, and gave ten to fifteen degrees port rudder, which caused his vessel to turn slightly to the left. According to Aubin's testimony the only distress signal that came from the boat was an oar that was raised by Dr. Lucas when the lead barge was only a few feet from the bass boat. At this point, it was too late for Aubin to take any action to change the course of the tug and tow.
The collision between the lead barge and the fishing boat then ensued, with the boat being capsized and both of the boat's occupants being thrown into the water. After the collision, Dr. Lucas and Schoonmaker began to swim to the boat launch site; however, the undertow from the barge pulled Schoonmaker under the water and he drowned. This suit by the wife and children of the deceased followed.

LIABILITY OF TOWING COMPANY
The plaintiffs assert on appeal that the jury's verdict finding no liability on the part of the Towing Company was manifestly erroneous. The jury found as a fact that Towing Company through its pilot was not negligent. It is well established that negligence in each case must be determined according to the particular facts and circumstances therein. Moore v. Brumfield, 459 So.2d 21 (La.App. 1st Cir.1984). Once the applicable standards of care are established, negligence is a question of fact for the trier of fact to determine. Oswald v. Rapides Iberia Management Enterprises, Inc., 452 So.2d 1258 (La.App. 2d Cir.1984), writ denied 457 So.2d 14 (La.1984).
In the absence of manifest error, a reviewing court should not disturb these factual determinations. In order to find manifest error, the record must support the conclusion that the factual determinations were clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The plaintiffs' argument that there is ample evidence to prove that the pilot of the defendant's tug was negligent ignores the evidence in the record which shows that the collision was caused by the joint negligence of Dr. Lucas and Schoonmaker in operating a small boat over which they had only marginal control in a waterway which was frequently traversed by commercial watercraft, such as tugs and barges. But for the two boatsmen losing control of their craft when they were on a course of safety, which loss of control brought them on a collision course with the barges and *485 the tugboat, this unfortunate collision would not have happened. We find no manifest error in the factual determinations of the jury. There is no merit in this argument on behalf of plaintiffs.

JURY INSTRUCTIONS
In this argument, appellants contend that the trial judge erred in giving a repetitive, confusing, misleading, and incoherent charge to the jury, and in commenting on the evidence during his charge to the jury. The appellants raised these issues in two specifications of error; but since they deal with the instructions to the jury, we will treat them together.
It is well established that a general objection to the court's proposed jury charge is insufficient to preserve the objection, and that specific objections must be made. Collins v. Christophe, 479 So.2d 537 (La. App. 1st Cir.1985), writ denied, 483 So.2d 1021 (La.1986). Here, counsel for plaintiffs objected to the trial judge's "ad-libbing" of the standard jury charge and the "detailed explanation" of some of the elements of the charge. However, when asked by the court to pinpoint any omissions or inaccuracies in the charge, appellants' counsel declined to do so:
The Judge: ... You said something about ad-libbing. Did you find something that should be given because of my ad-libbing, Mr. Trelles? That's serious.
Mr. Trelles: We would have preferred Your Honor read the charge as submitted to us for our refuse (sic), rather than the Court
The Judge: Well, what is it in there you want me to read? What is it that I missed?
Mr. Trelles: Judge, I think
The Judge: Let's go over them.
Mr. Trelles: Your Honor, I really don't
The Judge: Let's go over them.
Mr. Trelles: Well, I don't think we ought to go over the whole charge, Judge.
The Judge: You don't even want to go over them. You want me to get the jury in here and bore them, but you, yourself, won't even go over them, which means that you think it's redundant. Remember that these are general Louisiana Law of Negligence charges and I had to read the Rules of the Road. I couldn't read all this and then read the Rules of the Road. The Rules of the Road should tell them what to do. I just read a general Louisiana charge about 2315 and then I read the Rules of the Road. I think I did a good job. If you see something real pointed in here, important
Mr. Trelles: That's simply our objection, Your Honor.
The Judge: The objection is not even understood by the Court. Therefore, I will overrule it.
Specific objections are required so that the trial judge will have a fair opportunity to correct any error in his charge before the jury begins its deliberations. La.C.C.P. art. 1793 (C); Lea v. Baumann Surgical Supplies, Inc., 321 So.2d 844 (La. App. 1st Cir.1975), writ denied, 325 So.2d 279 (La.1976). Given plaintiffs' failure to set forth their objections with any degree of specificity, they are not permitted to raise such objections on appeal. Ryals v. Home Insurance Company, 410 So.2d 827 (La.App. 3rd Cir.1982), writs denied, 414 So.2d 375, 376 (La.1982).
Although certain portions of the trial court's charge were not read directly from a prepared text, there is nothing in the La.C.C.P. art. 1792 that requires word for word reading to the jury. Indeed, the trial judge has discretion to use whatever language he believes may be appropriate to help the jury understand the issues. Kolmaister v. Connecticut General Life Insurance Company, 370 So.2d 630 (La.App. 4th Cir.1979), writ denied, 373 So.2d 531 (La.1979). No particular structure or form of words need be used as long as the charge as a whole conveys to the jury a clear and correct understanding of the applicable law. Hanks v. Drs. Ranson, Swan & Burch, Ltd., 359 So.2d 1089 (La. App. 3rd Cir.1978), writ denied, 360 So.2d 1178 (La.1978). After carefully reviewing the trial judge's instructions in light of the *486 pleadings and evidence in this case, we find the instructions as given by the trial judge to fairly and reasonably point up the issues presented and to provide correct principles of law for the jury's application thereto. See Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App. 3rd Cir.1985), writs denied, 480 So.2d 738 (La.1986).
Plaintiffs complain for the first time on appeal that the trial judge made several improper comments on the evidence during the jury instructions. However, plaintiffs did not raise these objections at trial and are precluded from assigning such as error on appeal. Ryals, 410 So.2d at 832.

COMPROMISE SETTLEMENT
The appellants argue that the trial judge erred in advising the jury that the plaintiffs had settled with a party to the suit.
Plaintiffs' contention that the trial court erred in informing the jury of their compromise with Dr. Lucas' insurer, and its effect on Dr. Lucas, lacks merit. The fact of the settlement, but not the amount, was announced to the jury after voir dire examination, with plaintiffs' counsel's consent and approval. To have withheld this development from the jury would have led to confusion. Dr. Lucas' counsel, who had actively participated in the voir dire examination of the jury, was no longer a participant at the trial after State Farm was dismissed. With the explanation of the settlement, however, his absence from the trial was made known to the jury. The posture of the suit now became a suit for wrongful death by the wife and children of the deceased against only the Towing Company, the alleged tortfeasor.
While a compromise settlement is inadmissible to prove liability of a party or to show the terms of the settlement or the amount of money already received by a party, it is admissible, if made during the trial, to show a proper allignment of the parties, as was done in the instant case. See Launey v. Thomas, 379 So.2d 27 (La. App. 3rd Cir.1979), writ denied, 381 So.2d 1233 (La.1980). The case of Parker v. South Louisiana Contractors, Inc., 370 So.2d 1310 (La.App. 1st Cir.1979), writ denied, 374 So.2d 662 (La.1979), relied on by appellants, is factually distinguishable from the case at bar in that in Parker the settlement did not occur during the trial so there was no necessity to inform the jury as to the proper allignment of the parties. The informing of the jury of the settlement, but not its terms or amount, did not prejudice the plaintiffs' right to a fair trial.
Moreover, the plaintiffs' counsel formally approved the court's advising the jury that a settlement had been effected between plaintiffs and one of the defendants. Since plaintiffs failed to object to the court's informing the jury of the settlement, they waived any complaint which they might have had concerning the giving of this information to the jury. Senegal v. George Theriot's, Inc., 445 So.2d 137 (La. App. 3rd Cir.1984), writ denied, 448 So.2d 114 (La.1984). Under La.C.C.P. art. 1635, in the absence of an objection, the complaining party must be deemed to have waived his right to complain of the alleged impropriety on appeal. Calderon v. Johnson, 453 So.2d 615 (La.App. 1st Cir.1984).
Plaintiffs' contention that the trial judge thereafter erred by mentioning the settlement again in his response to jury questions regarding comparative negligence is also without merit. The jury was already properly informed of the settlement. The trial judge's comments in response to the jury question actually eliminated any possible confusion that may have resulted in prejudice to the plaintiffs. In addition, the plaintiffs failed to object here also.
For the foregoing reasons, the judgment appealed is affirmed at appellants' costs.
AFFIRMED.