632 So.2d 910 (1994)
Jimmy D. LUMAN, et al., Plaintiff-Appellant,
v.
HIGHLANDS INSURANCE COMPANY, et al., Defendants-Appellees.
No. 25445-CA.
Court of Appeal of Louisiana, Second Circuit.
February 23, 1994.
*912 Peters, Ward, Bright & Hennessy by J. Patrick Hennessy, Shreveport, Barham & Arceneaux by Mack E. Barham, Robert E. Arceneaux, Kathy S. Austin, New Orleans, for plaintiff-appellant, Jimmy D. Luman.
Blanchard, Walker, O'Quin & Roberts by Lawrence W. Pettiette, Jr., James W. Wyche, Shreveport, for defendant-appellee, B.F. Goodrich Co.
Before SEXTON, HIGHTOWER and VICTORY, JJ.
SEXTON, Judge.
Appellant, Jimmy Luman, was injured during the early morning hours of January 23, 1986 when a rubber hose exploded during an oil well "fishing" operation. Initially, three defendants were named and all except B.F. Goodrich, the manufacturer of the hose, were dismissed before the conclusion of the trial. The jury returned a verdict allocating 25 percent of the fault to Jimmy Luman and 75 percent to Crystal Oil Company, one of the settling defendants. Because B.F. Goodrich was not allocated any fault, judgment was entered dismissing appellant's claim at his costs. It is from this judgment that Luman now appeals asserting four assignments of error. We affirm.

FACTUAL HISTORY
Crystal Oil Company (Crystal) owned a well being reworked by a rig owned by Reliance Well Service (Reliance). Jimmy Luman was a Tri-State Oil Tool Industries (Tri-State) employee working as an oil field fishing tool operator on the rig. A bauxite-covered gauge ring and a junk basket became lodged in the well. To remedy the problem, the crew planned to pump a mixture of nitrogen, potassium chloride, and halco suds into the hole. When the process began, the crew was using Chicksan lines (2-inch flexible steel pipe) to pump the mixture into the well.
At that point, a decision was made to switch to rubber hose for the nitrogen injection process. The testimony is predictably in conflict regarding why this decision was made and who made it.
Appellant testified that Jim Tilley, the Crystal "company man" in charge of the job, ordered the switch because there was not enough Chicksan line at the site to complete the process and it would take approximately two hours or so to get more Chicksan from the Bossier office, whereas the rubber hose was already at the site. Tilley testified that appellant requested the switch to rubber hose because it was easier to handle than the Chicksan, although there was enough Chicksan at the site to continue using the Chicksan. Russell Jones, an employee of Haliburton Services, the nitrogen supplier, testified that Tilley ordered the switch because the process was moving too slowly using the Chicksan.
It appears from the jury's answers to interrogatories that the jury rejected Tilley's version. The record, particularly the action of Jones in clearing the rig, which we will discuss hereinafter, clearly supports such a determination.
The record reflects that hydraulic hoses are manufactured for installation into machines such as backhoes or tractors. They are designed to be permanent component parts of the particular machine into which they are installed. They are used to convey hydraulic fluid from a pressure source in the machine to a cylinder or motor in the same machine in order to cause motion.
The decision to use hydraulic hose was made despite the objections and fears expressed by Luman and Jones. Jones informed Tilley, who was himself a former employee of Haliburton, of the Haliburton policy against using rubber hoses to pump nitrogen. In response, Tilley ordered that the pressure exerted should not exceed 1700 pounds. Apparently, on January 22, 1986, appellant had ordered a power swivel and a 5000-pound rotary hose from the Tri-State Bossier office. Because the Bossier office did not have a power swivel, the Ruston office filled the whole order and sent the power swivel and the instant hose to the rig site. The actual hose sent to appellant was a *913 1125-pound hydraulic hose and was subsequently used to pump the nitrogen mixture into the well.
While standard procedure required members of the crew to assist in feeding the hose into the hole to prevent tangling or snagging of the hose, Jones ordered all the crew to stand back and away from the hose because of the danger involved. After working on the hole for 10 minutes, the pressure reached around 1750 to 1800 pounds and the hose exploded. The explosion caused the hose to whip around and crush Luman's right arm and throw him from the rig. Luman sustained a crushed right arm, comminuted fracture of the humerus, massive soft tissue loss, internal bleeding, a punctured lung, multiple rib fractures, a fractured scapula, and traumatic retinopathy of the right eye.

PROCEDURAL HISTORY
Initially, Aetna, Tri-State's workers compensation insurer, filed suit against Highlands Insurance Company (Crystal's liability insurer), B.F. Goodrich, and Haliburton. This suit alleged negligence on the part of Crystal and Haliburton and strict products liability on the part of Goodrich on grounds the hose was defective and unreasonably dangerous in normal use as designed and manufactured. Luman intervened, alleging the hose was defective as manufactured and designed and because of the failure to warn of an unreasonably dangerous condition inherent in the use of the hose. Aetna amended its petition to assert that the failure to label and to place a marking on the hose pertaining to the working pressure constituted negligence on Goodrich's part. Finally, Luman amended his intervention alleging that Goodrich failed to label with warnings or conditions under which it should be operated, particularly with regard to the working pressure. Before trial, Haliburton was dismissed as a defendant. During the trial, Luman settled with Highlands. The jury verdict allocated no fault to Goodrich. Judgment was entered in favor of Goodrich, from which Luman has appealed.
In his original brief, Luman asserts four assignments of error. He seeks a de novo review by this court of the jury's decision because of substantive errors asserted to have been committed by the trial court. These alleged errors consist of improper jury instructions and interrogatories in the verdict form that required the jury to consider the negligence of appellant's employer, Tri-State, in allocating fault.

DE NOVO REVIEW
Appellant asserts he is entitled to a de novo standard of review instead of the usual manifest error standard. In support of this assertion, appellant points to allegedly improper jury instructions and interrogatories made by the trial court on the verdict form.
Initially, we dispose of appellant's contention with respect to the interrogatories and verdict form. Appellant failed to make a contemporaneous objection to these interrogatories and the verdict form. Therefore, appellant failed to preserve any complaint he had with respect to these interrogatories that asked the jury to determine if appellant's employer, Tri-State, was at fault. Williams v. City of Alexandria, 376 So.2d 367 (La.App. 3d Cir.1979), writ denied, 378 So.2d 432 (La. 1979). Menzie Tile Company, Inc. v. Professional Centre, 594 So.2d 410 (La.App. 1st Cir.1991), writ denied, 600 So.2d 610 (La. 1992).
Appellant's assertions pertaining to allegedly improper jury instructions present a mixed and more difficult problem. Appellant complains about the trial court's failure to give proper jury instructions with respect to:
1) the independence of the ways in which a manufacturer's product can be considered unreasonably dangerous;
2) the definition of normal use of a product and foreseeable uses and misuses; and
3) what constitutes an adequate warning and the characteristics of an inadequate warning.
Louisiana Code of Civil Procedure article 1793 establishes a mandatory procedural rule for preserving an objection to the denial of a requested charge. A litigant must object to a refusal to give each special charge and state the grounds for each objection. Petitto v. McMichael, 588 So.2d 1144 *914 (La.App. 1st Cir.1991), writ denied, 590 So.2d 1201 (La.1992). The failure to specifically object to the trial court's failure to give a proposed instruction precludes review of the omission by an appellate court. Furthermore, a blanket objection to the denial of a requested jury charge without assigning reasons does not comply with the requirement that the party object to the instruction before or immediately after the jury retires in order to assign as error on appeal the giving or failure to give a proposed instruction. Anderson v. Fowler Trucking, Inc., 506 So.2d 1319 (La.App. 2d Cir.1987), writ denied, 512 So.2d 434 (La.1987). Specific objections and the grounds therefor are required to allow the trial court a fair opportunity to correct any erroneous or improper charges before the jury deliberates. Schoonmaker v. Capital Towing Company, 512 So.2d 480 (La.App. 1st Cir.1987), writ denied, 514 So.2d 458 (La.1987).
The trial court is not required to give the precise instruction submitted by a litigant. The court need only give instructions that properly reflect the applicable law and adequately convey the issues to the jury. Smith v. American Indemnity Insurance Company, 598 So.2d 486 (La.App. 2d Cir. 1992), writ denied, 600 So.2d 685 (La.1992). To determine the sufficiency of a jury charge, all charges should be read together as a whole. Wisner v. Illinois Central Gulf Railroad, 537 So.2d 740 (La.App. 1st Cir. 1988), writ denied, 540 So.2d 342 (La.1989).
Appellant argues that the trial court's instruction regarding when a product is unreasonably dangerous implied that it was necessary to find a defect in both the construction and the warning, or lack thereof, in order to find the manufacturer liable.
The only objection we were able to locate in the record with respect to this charge is counsel's statement that plaintiff had no objection to the Halphen[1] language used by the trial court which did not charge the jury regarding design defects. Thus, counsel did not inform the court that he was concerned that the trial court did not emphasize that a product could be unreasonably dangerous through either a construction defect or a lack of warning. This objection is therefore not preserved.
Moreover, we note that the charge given to the jury explained appellant's burden of proof, what constituted unreasonably dangerous in construction or composition, and the manufacturer's duty to provide an adequate warning. Taking as a whole the instructions given by the trial court on this subject, we think the instant instruction was sufficiently clear and adequate. Accordingly, we conclude this contention has no merit.
Appellant also complains about the jury instruction given by the trial court defining "normal use" of a product. Appellant urges that the trial court's instruction stressed the manufacturer's right to expect normal use of a product and failed to mention the obligation to expect all foreseeable product misuses. The actual instruction given to the jury stated:
As the manufacturer of the hose, B.F. Goodrich is entitled to expect a normal use of its hose.... Normal use is considered to be use in a manner for which the hose was made or adapted and all reasonably foreseeable uses and misuses of the hose.
Appellant had requested a jury instruction stating:
A manufacturer is required to provide an adequate warning of any dangers inherent to the normal use of its product which is not within the knowledge of or obvious to the ordinary user. "Normal use" is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product.
Appellant now asserts the trial court's instruction was not a substantial equivalent of controlling Louisiana law.
We disagree. The charge includes "foreseeable misuses" and provides the jury with a clear and adequate definition of normal use. This contention is also meritless.
*915 The final jury instruction complained of by appellant pertains to what constitutes an adequate warning. Appellant argues that the trial court failed to instruct the jury as to the characteristics of an inadequate warning. Essentially, appellant complains that the instruction by the court failed to state the proposition that "a warning label which is not clearly visible is not an adequate warning."[2]
The trial court's instruction explained that the determination of the adequacy of a warning depends upon a balancing of several considerations, and then it explained those considerations. One of the considerations listed by the court was the "proper placement of a warning ... so that it is clearly visible...." Hence, appellant's argument is without merit.
As previously mentioned, the trial court only needs to give instructions that are adequate. Adequate instructions are those that fairly and reasonably point out the issues and provide correct principles of law for the jury to apply. Smith v. American Indemnity Insurance Company, supra.
Because it is our conclusion that appellant's assignment of error pertaining to the jury instructions and the interrogatories on the verdict form is without merit, de novo review is not warranted. We therefore apply the manifest error standard of review to this case in addressing appellant's remaining assignments of error.

JURY'S FINDING GOODRICH NOT AT FAULT
Appellant's second assignment of error is that the jury committed error in not finding Goodrich at fault. Specifically, appellant urges that the failure to warn or provide an adequate warning made the hose unreasonably dangerous.
An appellate court may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989).
There was ample evidence presented at trial on which the jury could find that B.F. Goodrich was not at fault. There was evidence that the embossed warning on the hose in question was in full conformity with SAE regulations, although the warning did require the use of a technical manual to decipher it.[3] Goodrich also presented testimony that merely stamping the working pressure on the hose would be dangerous in that this alone could mislead the end user because other factors must be taken into consideration when choosing the proper hydraulic hose. Additionally, there was expert testimony that this hose had been misused in the past, and that even one prior misuse can ruin the maximum internal pressure that a hydraulic hose can withstand.
Goodrich also elicited testimony that it had never marketed its hydraulic hose as a general oil field hose. The head of marketing at the time of the accident testified to Goodrich's lack of any knowledge that its hydraulic hoses were being used in the oil field for non-hydraulic purposes, especially as drilling hoses and as conduits for nitrogen gas. Even one of appellant's expert witnesses testified that this non-hydraulic use of the hose constituted misuse.
Goodrich also presented a theory that the hose did not "explode," but rather ruptured or "pulled apart" due to the longitudinal force of the rig. In support of this theory, evidence was presented that the rig hands have a duty to help feed and guide an item going into the hole so that it does not become snagged on anything, or otherwise entangled. From the testimony presented at trial, it was clear that the Haliburton employee in charge *916 of the nitrogen truck, Russell Jones, ordered everyone, except for Luman, to stand back and away from the site. The order included the rig hands. All obeyed, thus no one was there to help guide the hose. The evidence also showed that all of the workers at the site were aware of the danger involved in pumping nitrogen through a rubber hose. Appellant testified that he had always used steel line to perform this function in the past and was scared to use rubber this time, but was ordered to do it by Tilley. An experienced petroleum engineer testified that he had never heard of pumping nitrogen with a rubber hose.
Goodrich also presented evidence that this hose was designed to withstand internal pressures greater than the maximum rating of 1125 PSIs for any hydraulic application. These hoses were physically tested before leaving the plant and withstood an internal pressure of 4100 PSIs. The hose in question was tested in 1991 at which time it withstood over 5000 PSIs. Again, we note the record evidence that the instant hose may have been misused in the past.
There was no evidence that appellant or any of the workers at the site hydrostatically tested the hose to ensure what internal pressure it could withstand. None of the workers could testify that they actually looked for a pressure rating on the hose, although they testified that they did not notice any. The record of the testimony of the workers at the site reveals that they were aware of the danger involved in pumping this nitrogen mixture through the rubber hose instead of the steel Chicksan line. Appellant, aware of the dangerous nature of the act about to occur, testified that he objected, yet still proceeded. He said he knew he could refuse to use the rubber hose and have this decision supported by his employer, Tri-State.
We therefore find significant support for the jury verdict exonerating B.F. Goodrich from fault for this accident. The verdict is not manifestly erroneous.

CONCLUSION
The aforesaid determinations preclude the necessity of addressing the other issues raised by the appeal and answer thereto. Thus, we find it unnecessary to address appellant's assignments of error regarding the jury's allocation of 25 percent of the fault to appellant and the damage award to which he should be entitled. Further, we do not address appellee's assignment of error pertaining to the trial court's admission of two of appellant's exhibits into evidence at trial.
The trial court judgment is affirmed at appellant's cost.
AFFIRMED.
NOTES
[1] Counsel was obviously referring to Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986).
[2] The record indicates that labels and warnings on hydraulic hoses are raised or imprinted, without coloration. The reason is that the hoses are expected to be painted over upon installation. This method thus preserves the labeling.
[3] The SAE (Society of Automotive Engineers) is an organization that develops promulgations for the hydraulic hose industry. The hose that was involved in appellant's accident was in compliance with the then-current promulgations by the SAE. These regulations require a warning that conveys the information necessary for users of hydraulic hoses to be able to select the proper hose for the proper piece of machinery by referring to standard SAE material.