677 So.2d 568 (1996)
Pearl P. PARKER, et al., Plaintiff-Appellants,
v.
CENTENARY HERITAGE MANOR NURSING HOME, et al., Defendant-Appellees.
No. 28401-CA.
Court of Appeal of Louisiana, Second Circuit.
June 26, 1996.
*570 Nelson, Hammons & Self by John L. Hammons, Shreveport, for Appellants.
Mayer, Smith & Roberts by Mark A. Goodwin, Shreveport, for Appellee.
Before HIGHTOWER, STEWART and GASKINS, JJ.
GASKINS, Judge.
The plaintiffs appeal from a jury verdict and from a trial court judgment denying their motions for judgment notwithstanding the verdict (JNOV) and for a new trial. The plaintiffs sued Schumpert Medical Center for the wrongful death of their husband and father, James Roy Parker. The jury found that Schumpert Medical Center was not negligent in its treatment of Mr. Parker. The trial court denied the plaintiffs' motions for JNOV and for new trial in which they objected to the verdict and argued that the jury misunderstood a jury interrogatory. For the following reasons, we affirm.

FACTS
The plaintiffs in this case are Pearl P. Parker, the widow of James Roy Parker and Mr. Parker's surviving children, James Kenneth Parker, Julia Ann Parker Urhig, John Richard Parker, Barbara Parker Strickland, Betty Parker Bounds and Penelope Parker *571 Nolte.[1] The plaintiffs filed a wrongful death and survival action against the Centenary Heritage Manor Nursing Home and Schumpert Medical Center, alleging that Mr. Parker suffered two falls while under the care of the defendants which ultimately led to his death. The plaintiffs settled their claim against Centenary Heritage Manor Nursing Home and proceeded to trial against Schumpert Medical Center.
Mr. Parker was eighty years old at the time of his death. He was a heavy smoker and had trouble walking. He had suffered a heart attack some years earlier and in the 1960's, had lost his left arm in a farming accident. He frequently fell at his home and required a great deal of assistance from his wife in walking, bathing and dressing, and getting in and out of bed.
In 1988, Mrs. Parker had surgery to remove cataracts from her eyes. Because Mrs. Parker was not able to care for her husband during her recuperative period, it was decided that Mrs. Parker would stay with their daughter, Julia Urhig, for several weeks and Mr. Parker would stay with their daughter, Barbara Strickland.
Mrs. Strickland and her spouse had recently opened a convenience store and restaurant adjacent to their home. Mrs. Strickland soon determined that she was unable to assist in the family business and care for her father. The family decided to place Mr. Parker in the Centenary Heritage Nursing Home temporarily, until Mrs. Parker could resume the care of her husband.
Mr. Parker was placed in the nursing home on April 13, 1988. In the late evening hours of April 15, 1988, Mr. Parker fell at the nursing home, suffering a cut on the back of his head. The nursing home telephoned Mrs. Parker at Mrs. Urhig's residence and informed her of the accident. She was told that Mr. Parker would be taken to Schumpert for treatment.
Mr. Parker was transported to the Schumpert emergency room and the cut on the back of his head was sutured. Donald LaRosse, the nurse on duty in the emergency room, testified that Mr. Parker was alert and talked about his career as a farmer. Mr. LaRosse left Mr. Parker in the treatment room and telephoned the nursing home that Mr. Parker was ready to return to the home. Mr. LaRosse also instructed a nursing assistant, Nancy Ann Duncan, to check on Mr. Parker. Ms. Duncan testified that Mr. Parker was on his stretcher and doing well when she checked him.
While Mr. LaRosse was telephoning a local ambulance company to transport Mr. Parker back to the nursing home, a loud crash was heard coming from Mr. Parker's treatment room. Mr. Parker had fallen from the stretcher on which he was lying. He was found on the floor of the room and had suffered a broken hip. Mrs. Parker and Mrs. Urhig were again contacted and Mr. Parker was admitted to the hospital, where he underwent surgery to repair the hip on April 16, 1988.
Mrs. Parker and Mrs. Urhig contend that when Mr. LaRosse called them from Schumpert to inform them of the second injury to Mr. Parker, they asked if Mr. Parker had been restrained and if the rails of the bed were up at the time of the accident. They testified that they were told Mr. Parker was not restrained and the rails of the bed were not up at the time of the accident.
Mrs. Parker and Mr. and Mrs. Urhig proceeded to Schumpert immediately. Mrs. Urhig testified that they arrived at the emergency room and determined that Mr. Parker had already been transferred to a room. Mrs. Urhig asked to speak to Mr. LaRosse. According to her, Mr. LaRosse stated that he wished he could tell her more, but that he had already said too much. He then walked away.
According to the plaintiffs, Mr. Parker was not coherent throughout his stay in the hospital. He had surgery on the morning of April 16, 1988 to repair the hip fracture. While still in the hospital, on April 20, 1988, Mr. Parker had a heart attack and died.
On April 13, 1989, the plaintiffs filed a wrongful death and survival action against the nursing home and Schumpert Medical *572 Center, claiming that the falls, the hip fracture and the surgery ultimately led to Mr. Parker's fatal heart attack. The plaintiffs settled their claim against the nursing home prior to trial and proceeded to trial against Schumpert. The case was tried before a jury on February 13-17, 1995.
On February 17, 1995, the jury returned a verdict in favor of Schumpert Medical Center. A polling of the jury showed that the decision was ten to two, in favor of Schumpert Medical Center. The first jury interrogatory stated as follows:
Was Schumpert Medical Center guilty of any negligence in its treatment of James Roy Parker?
The jury checked "no" as their response to this question. The interrogatory also stated that if the jury answered "no" to the question, their inquiry was over.
On February 17, 1995, the day the jury rendered its verdict, the foreman of the jury wrote a letter to the attorney for the plaintiffs. Based upon this letter, the plaintiffs requested a JNOV or new trial, claiming that the jury was unsure of the meaning of the word "treatment" in the first jury interrogatory. The plaintiffs' attorney obtained affidavits from the members of the jury regarding the existence of confusion about the word "treatment." The plaintiffs also argued that the bailiff improperly communicated with the jury regarding this interrogatory.
The plaintiffs attached the foreman's letter and the affidavits of the jurors to their motions for JNOV and new trial. The defendant filed a motion to strike the affidavits and letter, arguing that the motion did not allege that any outside influence was improperly brought to bear upon the jury, and therefore, these items were not admissible.
The trial court denied the JNOV and new trial and granted the motion to strike. In written reasons for judgment, the trial court stated that, during the course of the trial, the plaintiffs did not object to the first question on the jury form. The court then recounted the instructions given to the jury on negligence. The court stated that expert evidence at trial established that the standard of care requires the side rails of a bed to be up and that a disoriented patient not be left unattended. The court noted that the plaintiffs and the defendant presented conflicting evidence as to whether the bed rails were up and whether Mr. Parker was alert and oriented in the emergency room. The court concluded that the evidence for the defendant was such that reasonable jurors could differ on their conclusions. The court found that the decision of the jury, in favor of the defendant, was based upon a fair interpretation of the evidence. The plaintiffs appealed the jury verdict and the trial court's denial of the motions for JNOV and new trial.

JURY DELIBERATION AND INTERROGATORY
The plaintiffs argue that the bailiff's communication with the jury, regarding their confusion over the word "treatment" in the first jury interrogatory, was unauthorized and created an extraneous or undue influence which tainted the jury verdict. The plaintiffs also argue that the jury's confusion regarding the meaning of the word "treatment" caused them to incorrectly focus solely upon whether Mr. Parker's initial head wound was properly treated, rather than considering his entire experience in the emergency room. The plaintiffs raised these issues in a motion for JNOV or alternatively, for a new trial. The trial court denied these motions. The plaintiffs have appealed the denial of the motions. We find the plaintiffs' arguments to be without merit.

Unauthorized Communication
The plaintiffs argue that the bailiff in the trial court had unauthorized communication with the jury which tainted the jury verdict. According to the plaintiffs, the jury members expressed their confusion regarding the first jury interrogatory to the bailiff. The plaintiffs assert that the bailiff instructed the jury not to read anything into the interrogatory that was not written. The bailiff, Jada Suttle, testified that he told the jury if they had any questions, he would notify the judge and the attorneys and have everyone return to the courtroom so that the problem could be *573 addressed. He stated that he made this offer three times and that the jury declined.[2]
The plaintiffs argue that this was an unauthorized communication or act by a third person which created an extraneous influence on the jury. The plaintiffs contend that this constitutes an exception to the rule prohibiting a juror from testifying about jury misconduct or any matter that may explain, qualify or impeach the verdict, citing State v. Velez, 588 So.2d 116 (La.App. 3d Cir.1991), writ denied 592 So.2d 408 (La.), cert. denied, 505 U.S. 1220, 112 S.Ct. 3031, 120 L.Ed.2d 901 (1992). Under La.C.E. art. 606(B), which prohibits affidavits or testimony by a juror to impeach a verdict, a juror may testify on the question of whether any outside influence was improperly brought to bear upon the juror.
La.C.C.P. art. 1972, relative to mandatory grounds for granting a new trial, provides in pertinent part that a new trial shall be granted, upon contradictory motion of any party, when the verdict or judgment appears clearly contrary to the law and the evidence or when the jury was bribed or has behaved improperly so that impartial justice has not been done. Uriegas v. Gainsco, 94-1400 (La. App. 3d Cir. 9/13/95), 663 So.2d 162, writ denied, 95-2485 (La. 12/15/95), 664 So.2d 458. Improper behavior by a juror or jury is not defined and must be determined by the facts and circumstances of each particular case. Uriegas v. Gainsco, supra.
The possibility that the decision making process was tainted by an outside influence should not be overlooked as insignificant. However, not every instance of jury misconduct necessitates the granting of a new trial. Uriegas v. Gainsco, supra; Gormley v. Grand Lodge of the State of Louisiana, 503 So.2d 181 (La.App. 4th Cir. 1987), writ denied 506 So.2d 1227 (La.1987). A new trial is mandated only upon a showing that the jury misconduct was of such a grievous nature as to preclude the impartial administration of justice. Gormley v. Grand Lodge of the State of Louisiana, supra. On this issue, the mover bears the burden of proof. Uriegas v. Gainsco, supra.
In the present case, the communication between the bailiff and the jury does not constitute behavior of such a grievous nature as to preclude the impartial administration of justice. The bailiff gave no information that would influence the jury's deliberation one way or the other. Further, the plaintiffs did not show that the jury specifically requested that the bailiff convey concerns about the meaning of the interrogatory to the trial judge for clarification. The plaintiffs also did not show that any such request was denied.[3] We find that the trial court did not err in denying the plaintiffs' motion for new trial on this issue or in precluding the introduction of the affidavits and letter from the members of the jury.

Jury Confusion
The plaintiffs argue that the jury was confused regarding the word "treatment" in the first jury interrogatory and the trial court erred in failing to grant a JNOV or new trial on that basis. As stated earlier, in support of their motions, the plaintiffs submitted affidavits by several jurors and a letter from the jury foreman. The defendant filed a motion to strike the letter and the affidavits, arguing that under La.C.E. art 606(B), the affidavits and testimony of jurors cannot be used as evidence to impeach their verdicts. The trial court granted the motion to strike the letter and affidavits. The trial court then denied the plaintiffs' motions for JNOV and new trial. On appeal, the plaintiffs reassert their argument that the jury verdict was manifestly erroneous due to misunderstanding of *574 the first jury interrogatory. This argument is without merit.
We note that the plaintiffs did not object to the language in the interrogatory. The plaintiffs were given ample opportunity to review the interrogatory and make any objections they felt necessary at that time. The plaintiffs may not come into court after the jury verdict has been rendered and then argue that the interrogatory was unclear. The failure of either party to object to the charges results in a waiver of any alleged defect therein. Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3d Cir.1975), writ denied 321 So.2d 363 (La.1975). Therefore, the plaintiffs failed to preserve any complaint they may have had regarding this jury interrogatory. Luman v. Highlands Insurance Company, 25,445 (La.App. 2d Cir. 2/23/94), 632 So.2d 910.
The record also shows that the trial court fully apprised the jury of the law applicable to this case. During closing arguments, counsel for the plaintiffs explained the first interrogatory with the jury. Plaintiffs' counsel argued that, in determining whether Schumpert Medical Center was negligent in its treatment of the decedent, the jury must determine whether the bed rails were raised, whether there was a failure to observe Mr. Parker, and whether there was a failure to obtain a complete history from the patient. The plaintiffs' counsel argued that if any of these three factors were established, then the jury must conclude that Schumpert was negligent in its treatment of Mr. Parker.
At the hearing on the motions for JNOV and new trial, the judge stated that he recalled that counsel for the plaintiffs blew up the page containing the first jury interrogatory on a screen and very carefully instructed the jury how to answer the interrogatory. Further, defendant's counsel also argued to the jury how the defendant felt the interrogatory should be answered.
The sanctity and privacy of jury deliberations is strongly safeguarded in Louisiana. Neither party is allowed to unlock the closed door of those deliberations, except in very limited circumstances. As the trial court correctly found, Louisiana law is well settled that the affidavits and testimony of jurors cannot be used to impeach their verdicts. Theriot v. Theriot, 622 So.2d 257 (La. App. 1st Cir.1993), writ denied 629 So.2d 1138 (La.1993); Uriegas v. Gainsco, supra. La.C.E. art. 606(B) provides in pertinent part:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror,.... Nor may his affidavit or evidence of any statement by him concerning a matter which he may be precluded from testifying be received for these purposes.
One reason for this rule is that if, after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would invite tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under the sanction of oath. Uriegas v. Gainsco, supra.
The plaintiffs' assertion that the jury failed to understand the jury interrogatory is not a matter about which they are able to offer any admissible supporting proof. See and compare Theriot v. Theriot, supra and Druilhet v. Comeaux, supra. Further, as discussed above, there was no showing of an outside influence improperly brought to bear upon any juror which would allow introduction of juror testimony in this case. We also note that the plaintiffs do not argue that the trial court erred in granting the motion to strike the affidavits and letter. Therefore, there is nothing properly before this court to support the argument that the jury did not understand the interrogatory.
The record shows that the jury was made aware of the issues to be decided in *575 this case and the law to be applied to the facts presented. Based upon this record, and applying the applicable standards for review of motions for JNOV and new trial set forth above, we find that the trial court did not err in rejecting the plaintiffs' argument that the jury was confused and therefore rendered an erroneous verdict.

MANIFEST ERROR IN JURY VERDICT
The plaintiffs argue that the jury was manifestly erroneous in finding that Schumpert did not breach the applicable standard of care in this case and therefore, the trial court erred in denying their motion for JNOV on this issue. They contend that the applicable standard of care required that the rails of the patient's bed be raised and that a patient not be left unattended unless alert and oriented. They assert that the evidence showed that these standards were breached. This argument is without merit.

Legal Principles
Judgments notwithstanding the verdict are governed by La.C.C.P. art. 1811. This article does not, however, specify the grounds upon which a trial court may set aside a jury verdict. Willis v. Louisiana Power and Light Company, 524 So.2d 42 (La.App. 2d Cir.1988), writ denied 525 So.2d 1059 (La.1988). The standard for granting motions for JNOV has been developed jurisprudentially. JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, not merely when there is a preponderance of the evidence for the mover. Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064 (La.App. 2d Cir. 1992); Brantley v. General Motors Corp., 573 So.2d 1288 (La.App. 2d Cir.1991), writ denied 577 So.2d 17 (La.1991).
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria, just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991).
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." The Louisiana Supreme Court has announced a two-part test for the reversal of a fact finder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La. 1993), citing Mart v. Hill, 505 So.2d 1120 (La.1987).
Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the fact finder, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State, Department of Transportation and Development, supra.

Duty of Hospital
Hospitals are bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974); Borne v. St. Francis Medical Center, 26,940 (La.App. 2d Cir. 5/10/95), 655 So.2d 597, writ denied 95-1403 (La. 9/15/95), 660 So.2d 453. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly *576 within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the facts and circumstances of that case. Borne v. St. Francis Medical Center, supra. In finding or refusing to find a breach of duty, the finder of fact has great discretion. Borne v. St. Francis Medical Center, supra.

Discussion
There is no dispute that the standard of care in this case required that the bed rails on Mr. Parker's emergency room stretcher be raised to the upright position. The standard of care also required that Mr. Parker not be left unattended unless he was alert and oriented. The plaintiffs contend that the jury erred in finding that these standards of care were not breached by Schumpert Medical Center.
The plaintiffs assert that they were told by Donald LaRosse, the emergency room nurse, that the bed rails were not up when Mr. Parker fell from the stretcher. The plaintiffs also point out that the emergency room records contain no notation whatever regarding the position of the bed rails. They contend that Mr. Parker, an eighty year old man with only one arm, could not have climbed over the bed rails. Therefore, the plaintiffs argue that the bed rails must have been down when Mr. Parker fell.
The plaintiffs argue that the testimony and evidence also fails to show that Mr. Parker was alert and oriented in the emergency room. They assert that, although Mr. LaRosse testified that Mr. Parker told him about his career as a farmer, Mr. Parker related nothing about how he fell at the nursing home earlier that evening. The plaintiffs note that Mr. Parker did not sign the consent to treatment form in the emergency room and that on the form, Mr. LaRosse noted that the patient was unable to sign. The plaintiffs assert that these facts demonstrate that Mr. Parker was not alert and oriented and that Schumpert Medical Center breached the applicable standard of care in leaving him unattended.
Mr. LaRosse testified that Mr. Parker was brought into the Schumpert emergency room at forty minutes after midnight on April 16, 1988. He stated that Mr. Parker was placed on a stretcher in a treatment room and his bed rails were placed in an upright position with the bed in the lowest position and the wheels were locked.
Mr. Parker told Mr. LaRosse that he fell and hit the floor at the nursing home. A Glasgow Coma Scale was used on two occasions to determine whether Mr. Parker had any neurological problems. This scale evaluates the eyes, motor response and verbal response. The highest possible score on this scale is fifteen. Mr. Parker achieved a perfect score on both occasions this test was administered to him in the emergency room. The patient's head wound was sutured and, while Mr. LaRosse was arranging transportation back to the nursing home, a crash was heard coming from Mr. Parker's treatment room. Mr. LaRosse testified that Mr. Parker was found in a sitting position by the foot of the stretcher and the side rails were still elevated. However, Mr. LaRosse's notes made shortly after the fall show that the patient was found lying on his right side. Mr. LaRosse denied ever telling Mrs. Urhig that the bed rails were not up when Mr. Parker fell. Mr. LaRosse did not offer an explanation regarding why Mr. Parker was unable to sign the consent to treatment form.
Nancy Ann Duncan, a nursing assistant, testified that immediately prior to Mr. Parker's fall, she entered the treatment room, as instructed, to check on the patient. Apparently Ms. Duncan was the last person to see Mr. Parker before his fall. She testified that Mr. Parker's bed rails were up, the wheels of the stretcher were in the locked position and his call button was in place. According to Ms. Duncan, she observed Mr. Parker for approximately three to four minutes and he appeared to be coherent and lucid.
Dr. Charles Black, an emergency room physician and a member of the medical review panel in this case, noted that the emergency room physician who treated Mr. Parker for his initial injury did not chart any mental abnormality. Dr. Black stated that it would be possible for an individual with one *577 arm to climb over bed rails.[4] Dr. Black also offered several possible explanations regarding why someone with a high Glasgow Coma Scale score would not be able to sign a consent to treatment form. Dr. Black specifically noted that Mr. Parker had undergone cataract surgery in the past and there was nothing to indicate whether he had his glasses with him in order to see well enough to sign the form.
Contrary to Dr. Black's testimony, Dr. David T. Henry, Mr. Parker's admitting physician, testified that it would be difficult for Mr. Parker to get over raised bed rails due to his age and his handicap.
Dr. Tom Arnold, also an emergency room physician and a member of the medical review panel in this case, testified that inability to sign a consent to treatment form is not inconsistent with a perfect score on the Glasgow Coma Scale. Dr. Arnold testified that the medical review panel determined that the weight of the evidence showed that the bed rails were up at the time of Mr. Parker's fall and the standard of care did not require constant observation for someone who was alert and oriented.
The only indication that the bed rails were not up in this case is the testimony of Mrs. Parker and Mrs. Urhig. When Mr. LaRosse called to report Mr. Parker's second injury, both ladies were on the telephone during the conversation. They contend that Mr. LaRosse told them that the bed rails were down when Mr. Parker fell. However, the testimony of these two witnesses was inconsistent regarding who made the inquiry about the position of the bed rails. Further, Mrs. Urhig testified that she made contemporaneous notes of the conversation on a telephone directory, but at the time of trial, the directory had been lost. We also note that Mrs. Urhig's testimony shows that she frequently could not remember events that occurred on the evening her father was injured.
The record before us shows that there is conflicting testimony regarding whether the standard of care was breached in this case. However, there is sufficient evidence to support a finding that the bed rails were up at the time of the fall and that Mr. Parker was alert and oriented prior to the fall, making constant observation by emergency room personnel unnecessary. In light of this record, viewed in its entirety, the trial court did not err in denying the plaintiffs' motion for JNOV. The jury's finding that the standard of care was not breached in this case is reasonable. The jury's verdict is not clearly wrong or manifestly erroneous. Accordingly, the jury's finding that Schumpert Medical Center was not negligent in its treatment of the decedent is affirmed.[5]

CONCLUSION
For the reasons stated above, we affirm the jury verdict in favor of the defendant, Schumpert Medical Center, rejecting the claims of the plaintiffs, Pearl P. Parker, James Kenneth Parker, Julia Ann Parker Urhig, John Richard Parker, Barbara Parker Strickland, Betty Parker Bounds and Penelope Parker Nolte. We also affirm the trial court judgment rejecting the plaintiffs motions for judgment notwithstanding the verdict and for new trial. Costs in this court and in the court below are assessed to the plaintiffs.
AFFIRMED.
NOTES
[1] One daughter predeceased Mr. Parker.
[2] We note that this testimony was ordered sealed by the trial court. However, we have determined that the bailiff's testimony is pertinent to the issue of whether undue influence was brought to bear upon any juror in this case and therefore is not prohibited under La.C.E. 606. Accordingly, we have examined that testimony in our review of the issues presented in this case. However, as discussed below, the trial court correctly excluded juror's affidavits and letters under La.C.E. art. 606.
[3] See Gormley v. Grand Lodge of Louisiana, supra, in which the judge's law clerk entered a jury room during deliberations and took a question from the jury back to the court. This conduct was found not to be of such a grievous nature as to impair the impartial administration of justice.
[4] Gwendolyn Jett, the nurse in charge of Mr. Parker's care at Centenary Heritage Manor Nursing Home, testified that the patient's bed rails were still up after Mr. Parker's fall in the nursing home.
[5] In their brief to this court, the plaintiffs argue that Schumpert Medical Center was negligent in altering the times listed in the emergency room nursing notes and in failing to obtain a complete history of Mr. Parker's injury in the nursing home. We note that the issue of altering the times in the nursing notes was not raised in the court below. However, the plaintiffs have failed to demonstrate that either of these factors in any way impacted upon Mr. Parker's treatment.